STATE of North Dakota,
Plaintiff-Appellee,

v.

Russell METZNER, Defendant-Appellant.

Crim. No. 532.

Supreme Court of North Dakota.

June 11, 1976.

Robert O. Wefald, Bismarck, for appellant.

John M. Olson, State's Atty., Bismarck, for appellee.

PAULSON, Judge.

The defendant, Russell Metzner, after trial to a jury in Burleigh County District Court, appeals from his conviction of the crime of burglary.

Metzner was convicted of the February 17, 1975, burglary of the Lauer Repair shop, a business establishment located at 309 South Washington Street in Bismarck. Also convicted of the same burglary was Donald Kerry Klesalek, Metzner's co-defendant at trial. Klesalek, however, has not appealed from his conviction.

The facts are not in dispute. At approximately 12:30 a. m. on February 17, 1975, Patrolman Dennis Walls of the Bismarck Police Department investigated a vehicle parked in an alley on the north side of the Lauer Repair shop. After calling for a backup unit, Patrolman Walls checked the vehicle and found footprints in newly fallen snow, leading from the driver's side of the vehicle to a window on the north side of the Lauer Repair shop. The second window on the north side of the building was broken and a tire wrench was lying on the ground about three feet from the broken window. Patrolman Walls observed a second set of footprints in the snow near such window.

Shortly thereafter, Sergeant Darrell Neas of the Bismarck Police Department Detective Division and Darrell Lauer, owner of the Lauer Repair shop, arrived at the scene. After Lauer unlocked the building's front door they went inside, where they discovered Klesalek in the bathroom. Sergeant Neas placed Klesalek under arrest for burglary, conducted a pat-down search, and advised Klesalek of his constitutional rights.

In the meantime, Patrolmen Donald Schaffer and David Torkildson were following the footprints which had been left in the snow near the broken window on the north side of the Lauer Repair shop. This set of footprints was not the same set which Patrolman Walls had followed from the driver's side of the parked vehicle in the alley, but was a second set of footprints found in the general area of the broken window. No attempt was made to determine the origin of the second set of footprints.

Patrolmen Schaffer and Torkildson followed the footprints to a trailer home located in a trailer court located on West Sweet Avenue. Both officers observed that the footprints which they were following led up to the trailer home, and that the same footprints then led away from the trailer home. Schaffer then returned to the Lauer Repair shop and Torkildson remained outside of the trailer home, awaiting Schaffer's return. Patrolman Schaffer returned to the trailer home with the police squad car. He was accompanied by a Patrolman Rohrer.

After returning to the trailer home, Patrolman Schaffer knocked on the door and spoke with a man whom he identified as Clarence Hagel, owner of the trailer home. After ascertaining that no occupant of the trailer home was the person who had left the footprints in the snow, the officer left.

In the meantime, Patrolman Torkildson continued following the footprints as they led away from the trailer home. He followed the footprints to the back door of a house located at 912 West Sweet Avenue. Patrolman Torkildson then radioed his position and requested assistance, and shortly thereafter was joined by Patrolmen Schaffer and Rohrer.

Patrolman Schaffer knocked on the door of the house at 912 West Sweet Avenue; a person later identified as the defendant, Russell Metzner, opened the door. Metzner was standing in the doorway in his stocking feet. Schaffer asked Metzner if he had been out during that evening and Metzner replied that he had been over to see his girl friend in the trailer court. Schaffer asked to see Metzner's shoes or boots and Metzner walked into the living room, returned with his boots, and gave them to Patrolman Schaffer. The officers did not enter the house. Schaffer examined the boots, observed that the soles and a little bit of the leather uppers were wet, and that the square toe and the criss-cross heel pattern were similar to the pattern made by the footprints which they had been following from the Lauer Repair shop. Schaffer compared one of the boots with the footprints located directly below the doorstep at 912 West Sweet Avenue, and Schaffer concluded that the boot was identical to the boot which had left the impression in the snow. Schaffer thereupon placed Metzner under arrest for burglary, advised him of his constitutional rights, and returned to the Lauer Repair shop with Metzner in custody. At the Lauer Repair shop, Schaffer again compared the boot seized from Metzner with the footprints in the snow and concluded that they were identical.

On February 18, 1975, Metzner appeared before Judge Gerald G. Glaser of the Burleigh County Court of Increased Jurisdiction on a charge of burglary, at which time bond was set. Mr. Burt L. Riskedahl, a Bismarck attorney who was then representing Metzner in another case pending in Burleigh County, was appointed to represent Metzner on the burglary charge. On April 30, 1975, Judge Glaser conducted the preliminary hearing and thereafter Metzner was bound over to district court for trial on a charge of burglary.

On May 9, 1975, the Burleigh County District Court conducted a hearing on Metzner's request for the appointment of counsel at county expense. After such hearing, the district court, with the consent of Metz-ner, appointed Mr. Riskedahl to represent Metzner at county expense. On May 15, 1975, counsel for Metzner filed with the district court a motion to sever Metzner's trial from Donald Kerry Klesalek's trial on the same charge. Such motion was subsequently denied.

On May 21, 1975, Metzner, through his counsel, filed a motion to suppress evidence allegedly seized unlawfully at the time of his arrest—namely, the boots which were examined and compared with the footprints in the snow on the night of Metzner's arrest. After hearing such motion on May 28, 1975, the district court orally denied Metzner's motion to suppress evidence, concluding that the boots were lawfully seized by the police officers.

After trial to the jury, Metzner, on May 30, 1975, was found guilty of burglary. He was sentenced on June 24, 1975, to a term of one year at the State Farm. Sometime after such sentencing hearing, Metzner advised Mr. Riskedahl of his desire to appeal the conviction, and also of his desire to retain different counsel for such appeal. On July 28, 1975, Metzner requested that all of the documents in Riskedahl's possession relating to the burglary case be forwarded to him. On July 29 or 30, 1975, Riskedahl delivered the requested documents to Metzner at the State Penitentiary in Bismarck.

On August 13, 1975, a notice of appeal was filed with the clerk of the Burleigh County District Court. Such notice was dated July 31, 1975, was signed by Metzner, and was notarized on August 1, 1975. On August 14, 1975, the clerk of the Burleigh County District Court caused notice of the filing to be issued.

On September 15, 1975, Metzner filed a motion with the Burleigh County District Court requesting that Burt L. Riskedahl be relieved as counsel for Metzner. On September 25, 1975, Mr. Riskedahl filed a "Notice of Withdrawal of Counsel", and on September 30, 1975, the Burleigh County District Court granted Metzner's motion and entered its order permitting Mr. Riskedahl's withdrawal from the case.

Metzner thereafter proceeded *pro se,* acting as his own attorney, until May 6, 1976, when he requested a continuance from this Court to permit him to secure counsel. On May 6, 1976, we granted Metzner's request for a continuance of this case until June 2, 1976, to permit Metzner to obtain the services of counsel to further prosecute this appeal. On May 20, 1976, by order of the district court, Mr. Robert O. Wefald, a Bismarck attorney, was appointed to represent Metzner in his appeal to this Court; and, on June 2, 1976, Mr. Wefald appeared before this Court and presented oral argument in Metzner's behalf.

On appeal, Metzner contends that he was deprived of his rights, pursuant to the following Amendments to the United States Constitution:

1. Fourth Amendment protection against unreasonable searches and seizures,
2. Fifth Amendment privilege against self-incrimination, and
3. Sixth Amendment guarantee of the effective assistance of counsel to aid in his defense.

The State contends, however, that Metzner's appeal is not properly before this Court for review. As noted, entry of judgment and sentencing occurred on June 24, 1975; the notice of appeal was dated July 31, 1975, notarized on August 1, 1975, and filed in the office of the Clerk of the Burleigh County District Court on August 13, 1975.

Rule 37(b), N.D.R.Crim.P., states:

"*(b) Time for appeal—When taken. The notice of appeal by a defendant shall be filed with the clerk of the trial court within ten days after the entry of the judgment or order appealed from. A no-*tice of appeal filed after the announcement of the verdict, decision, sentence, or order but before entry of the judgment or order shall be treated as filed after such entry and on the day thereof.* If a timely motion in arrest of judgment or for a new trial on any ground other than newly discovered evidence has been made, an appeal from a judgment of conviction may be taken within ten days after the entry of an order denying the motion. A motion for a new trial based on the ground of newly discovered evidence will similarly extend the time for appeal from a judgment of conviction if the motion is made before or within ten days after entry of the judgment. When an appeal by the prosecution is authorized by statute, the notice of appeal shall be filed with the clerk of the trial court within thirty days after the entry of judgment or order appealed from. A judgment or order is entered within the meaning of this subdivision when it is entered in the criminal docket.* Upon a showing of excusable neglect the trial court may, before or after the time has expired, with or without motion and notice, extend the time for filing a notice of appeal for a period not to exceed thirty days from the expiration of the time otherwise prescribed by this subdivision.*" [Emphasis added.] [1]

Rule 4(b), N.D.R.App.P., states:

"*(b) Appeals in criminal cases. In a criminal case the notice of appeal by a defendant shall be filed with the clerk of the trial court within ten days after the entry of the judgment or order appealed from. A notice of appeal filed after the announcement of a decision, sentence, or order but before entry of the judgment or order shall be treated as filed after*

---

1. Rule 37, N.D.R.Crim.P., was adapted from Rule 37, F.R.Crim.P. However, Rule 37 in the Federal Rules of Criminal Procedure was abrogated in 1968 with the adoption of Rule 4(b), F.R.App.P., and all proceedings of this nature are now governed by Rule 4(b), F.R.App.P., although no change in meaning or application was intended. 2 Wright, Fed.Prac. & Proc. § 621 (West 1969). Both Rules are intended to be applied in the same manner, depending on the court in which the case was originally heard. Explanatory Note to Rule 37, N.D.R. Crim.P., Criminal Rules Manual (State Bar Ass'n 1973). We perceive no difference in the standard set by either Rule, and consider the practice pursuant to either Rule to be identical to the practice under Former Rule 37(b), F.R. Crim.P., and currently pursuant to Rule 4(b), F.R.App.P.

such entry and on the day thereof. If a timely motion in arrest of judgment or for a new trial on any ground other than newly discovered evidence has been made, an appeal from a judgment of conviction may be taken within ten days after the entry of an order denying the motion. A motion for a new trial based on the ground of newly discovered evidence will similarly extend the time for appeal from a judgment of conviction if the motion is made before or within ten days after entry of the judgment. When an appeal by the state is authorized by statute, the notice of appeal shall be filed with the clerk of the trial court within thirty days after the entry of the judgment or order appealed from. A judgment or order is entered within the meaning of this subdivision when it is entered in the criminal docket. *Upon a showing of excusable neglect the trial court may, before or after the time has expired, with or without motion and notice, extend the time for filing a notice of appeal for a period not to exceed thirty days from the expiration of the time otherwise prescribed by this subdivision."* [Emphasis added.]

The defendant in a criminal action therefore has ten days after entry of the judgment within which a notice of appeal must be filed with the trial court. Such time period may be extended for an additional thirty days—making a total of forty days— by order of the trial court upon a showing of excusable neglect.

 The United States Supreme Court has held that the time requirement within which a defendant in a criminal action must file notice of appeal is mandatory and jurisdictional. *United States v. Robinson*, 361 U.S. 220, 80 S.Ct. 282, 4 L.Ed.2d 259 (1960); *Berman v. United States*, 378 U.S. 530, 84

S.Ct. 1895, 12 L.Ed.2d 1012 (1964) (*per curiam*); 9 Moore's Federal Practice ¶ 204.16, pp. 987–989. The requirement pursuant to Rule 4(b), N.D.R.App.P., and Rule 37(b), N.D.R.Crim.P., is likewise mandatory and jurisdictional.[2] Unless extended by the district court, upon a showing of excusable neglect, compliance with the ten-day limit set forth by Rule 4(b), N.D.R.App.P., and by Rule 37(b), N.D.R.Crim.P., is required. While this Court may waive compliance with procedural rules addressed to the timely prosecution of an appeal, *Nodak Mutual Ins. Co. v. Loeffler*, 225 N.W.2d 286 (N.D. 1974), we cannot waive compliance with the jurisdictional requirement that the notice of appeal be timely filed. Rule 26(b), N.D.R. App.P.

 In the instant case, there is nothing in the record showing that Metzner communicated to the district court, within the time requirements set forth in Rule 4(b), N.D.R. App.P., and in Rule 37(b), N.D.R.Crim.P., his intent to appeal from the burglary conviction. The earliest manifestation to the district court of such intent was the filing, on August 13, 1975, of Metzner's notice of appeal. Such filing occurred much later than even the forty-day period allowed where the district court has granted an extension of time upon a showing of excusable neglect. In this case, no request for such an extension has ever been presented to the district court. There is nothing in the record from which this Court can determine that the district court implicitly extended the time for filing a notice of appeal. In addition, Metzner has made no claim that he was not informed of his right to appeal. We therefore conclude that Metzner's notice of appeal in this case was not timely filed with the clerk of the district court, and that the appeal should therefore be dismissed.

---

2. Such practice corresponds favorably with the decisions of this Court in *Huso v. Bismarck Public School Board*, 219 N.W.2d 100 (N.D. 1974); and in *Farmers Union Grain Terminal Ass'n v. Briese*, 192 N.W.2d 170 (N.D.1971), where this Court held that the time requirement within which an aggrieved party in a civil action must file a notice of appeal is mandatory and jurisdictional. Although such practice has been criticized, particularly in 9 Moore's Federal Practice ¶ 204.16, pp. 989–990, it remains the long-standing rule that an appellate court has no jurisdiction to hear an appeal where the notice of appeal is not timely filed. See *Cottle v. Kranz*, 231 N.W.2d 777 (N.D.1975).

However, in light of the seriousness of the constitutional errors asserted by Metzner, and in light of the strong possibility that the same issues will be presented by a petition for relief pursuant to Chapter 29–32, N.D.C.C. (Uniform Post-Conviction Procedure Act), we will nevertheless review the merits of Metzner's claim. The issues raised by Metzner have been briefed, counsel both for the State and Metzner have presented oral argument to this Court on such issues, and we perceive no benefit which would be achieved by deferring our consideration of the constitutional errors asserted by Metzner.

## FOURTH AMENDMENT ISSUE

Metzner contends that the police seizure of the boots violated his Fourth Amendment protection against unreasonable searches and seizures.[3] Consequently, Metzner claims, the boots and any testimony concerning the boots should have been excluded at trial.

■ In the instant case, the police officers who were investigating the burglary at the Lauer Repair shop followed footprints in the snow, which footprints led to the back door of the house in which Metzner was subsequently arrested. The police officer knocked on the back door of the house, Metzner answered, and the officer asked Metzner whether or not he had been out of the house that night. Metzner said that he had been. The officer asked to see Metzner's boots. Metzner went into the living room and returned to the back door with the boots, handing them over to the police officer. At no time did either of the police officers enter the house. After comparing one of the boots with the footprints in the snow, the police officer placed Metzner under arrest for burglary and advised him of his *Miranda* rights. We conclude that no violation of Metzner's Fourth Amendment rights occurred.

In *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the United States Supreme Court held that a warrantless search conducted with the consent of the accused was a valid and permissible search pursuant to the Fourth Amendment. We believe that the situation presented for our review in the instant case is similar to the consent search presented to the United States Supreme Court in *Schneckloth.*

■ In determining whether or not the accused voluntarily consented to the search and seizure, we look to the totality of the circumstances in each individual case to determine whether or not consent was freely and voluntarily given. *Schneckloth v. Bustamonte, supra*; *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *cf. State v. Manning*, 134 N.W.2d 91 (N.D.1965).

In *Schneckloth, supra*, 412 U.S. at 227–229, 93 S.Ct. at 2048, 2049, the United States Supreme Court explained:

"In situations where the police have some evidence of illicit activity, but lack probable cause to arrest or search, a search authorized by a valid consent may be the only means of obtaining important and reliable evidence. In the present case for example, while the police had reason to stop the car for traffic violations, the State does not contend that there was probable cause to search the vehicle or that the search was incident to a valid arrest of any of the occupants. Yet, the search yielded tangible evidence that served as a basis for a prosecution, and provided some assurance that others, wholly innocent of the crime, were not mistakenly brought to trial. And in those cases where there is probable cause to arrest or search, but where the police

---

**3.** In *Wolf v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), the United States Supreme Court held that the Fourth Amendment protections against unreasonable searches and seizures were enforceable against the States through the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. In *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), the United States Supreme Court held that such constitutional protections were enforceable by application of the exclusionary rule in criminal proceedings brought in state courts.

lack a warrant, a consent search may still be valuable. If the search is conducted and proves fruitless, that in itself may convince the police that an arrest with its possible stigma and embarrassment is unnecessary, or that a far more extensive search pursuant to a warrant is not justified. In short, a search pursuant to consent may result in considerably less inconvenience for the subject of the search, and, properly conducted, is a constitutionally permissible and wholly legitimate aspect of effective police activity.

"But the Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed. In the words of the classic admonition in *Boyd v. United States*, 116 U.S. 616, 635, 6 S.Ct. 524, 535, 29 L.Ed. 746:

"'It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.'

"The problem of reconciling the recognized legitimacy of consent searches with the requirement that they be free from any aspect of official coercion cannot be resolved by any infallible touchstone. To approve such searches without the most careful scrutiny would sanction the possibility of official coercion; to place artifi-

cial restrictions upon such searches would jeopardize their basic validity. Just as was true with confessions, the requirement of a 'voluntary' consent reflects a fair accommodation of the constitutional requirements involved. In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents. Those searches that are the product of police coercion can thus be filtered out without undermining the continuing validity of consent searches. In sum, there is no reason for us to depart in the area of consent searches, from the traditional definition of 'voluntariness.' "

The California Court of Appeals, in *People v. Perez*, 243 Cal.App.2d 528, 52 Cal. Rptr. 514 (1966), held that a package of heroin seized after the defendant had thrown it away was admissible. The California court reached such conclusion on the basis that there was no threat by the officers to search, although the defendant had been stopped for questioning. In *Perez*, the court stated, in 52 Cal.Rptr. at 517:

"If in response to a reasonable official inquiry, a suspect voluntarily reveals incriminating evidence, he may not later complain that he acted on an implied threat of unlawful conduct of the officers."

In the instant case, Metzner's production of the boots in question was clearly voluntary. There was no threat to search; there was no intimation by the officers that they had a right to enter the house to search for Metzner's boots. In following the footprints to the back door of the house, and in knocking on the door of the house to further investigate the suspicious circumstances, the officers were acting reasonably. In fact, an earlier investigation conducted in the same manner had resulted in the elimination of the occupants of a trailer home as possible suspects in the burglary.

In response to the officer's inquiry, Metzner voluntarily produced his boots and

handed them to Officer Schaffer, who, thereafter, compared one of the boots with the footprints in the snow and then arrested Metzner. Such police conduct is reasonable. Like the situation presented in *Schneckloth*, there is no evidence in the instant case of inherently coercive tactics, either in the police questioning or in the environment in which it took place. *See also, United States v. Watson, supra* (custody alone is not enough in itself to demonstrate a coerced confession or coerced consent to search).

We therefore conclude that there was no violation of Metzner's Fourth Amendment protection against unreasonable searches and seizures. Consequently, the district court properly admitted the boots, and testimony concerning the boots, into evidence at Metzner's trial.

## FIFTH AMENDMENT ISSUE

Metzner asserts that the police seizure of his boots violated his Fifth Amendment privilege against self-incrimination, because he was not informed of his rights, pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), before the police officer requested that he produce his boots.[4]

 In general, an accused person must be adequately apprised of his constitutional rights when the police conduct a custodial interrogation of the suspect. *Miranda v. Arizona, supra*; *State v. Iverson*, 187 N.W.2d 1 (N.D.1971), *cert. den.* 404 U.S. 956, 92 S.Ct. 322, 30 L.Ed.2d 273. Such requirement extends to custodial interrogation even in the accused's own home. *Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969). But, as this Court held, in *Iverson, supra*, 187 N.W.2d at 7, in paragraph 2 of the syllabus:

"2. A witness questioned in a general investigation which has not focused upon him need not be given the *Miranda* warnings."

 Metzner strenuously contends, based upon such decisions, that the police questioning which resulted in his production of the boots was unlawful, because *Miranda* warnings were not given before any questions were asked about his footwear. It is Metzner's position that the investigation had already focused upon him when Officer Schaffer was told by Metzner that Metzner had been outside of the house that evening, and that the *Miranda* warnings should therefore have been given before further questioning.

We are not persuaded by Metzner's argument that the investigation had focused upon him, as that term is used in *Miranda*, before the officers were able to ascertain that the boot produced by Metzner was similar to the bootprint in the snow outside of Metzner's house. In addition, we are not persuaded that a "custodial interrogation" took place when the police officer, as part of a routine investigation, asked Metzner questions about the footprints which led up to his door. There is a total absence of coercion present in the situation described in this case. The officers used no threat of force or threat of authority to induce Metzner to cooperate in their investigation. They did not request him to leave the house until after they had ascertained that the boots which Metzner himself produced were identical to the footprints which they had followed from the Lauer Repair shop.

In *Beckwith v. United States*, —— U.S. ——, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976), the United States Supreme Court distinguished a "focus" for purposes of investigation from the "focus" described in *Miranda*, where such court held that an investigatory interview of the defendant by agents of the Internal Revenue Service was not a custodial interrogation which had "focused" on the defendant within the definition of the term "focus" in *Miranda*.

However, we do not find it necessary to rely solely upon our determination that the investigation had not focused upon Metzner

---

4. The Fifth Amendment to the U.S. Constitution is applicable to criminal proceedings in a state court by virtue of the Fourteenth Amend-
ment. *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

at the time when he was questioned by Officer Schaffer about his footwear. In *Fisher v. United States*, —— U.S. ——, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976), the United States Supreme Court, in discussing the application of the Fifth Amendment to the United States Constitution to the compelled production of evidence, stated, 96 S.Ct. at page 1579:

> "It is also clear that the Fifth Amendment does not independently proscribe the compelled production of every sort of incriminating evidence but applies only when the accused is compelled to make a *testimonial* communication which is incriminating." [Emphasis in original.]

In *Schmerber v. California*, 384 U.S. 757, 761–765, 86 S.Ct. 1826, 1830–1833, 16 L.Ed.2d 908, the United States Supreme Court explained:

> "We therefore must now decide whether the withdrawal of the blood and admission in evidence of the analysis involved in this case violated petitioner's privilege. We hold that the privilege protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature, and that the withdrawal of blood and use of the analysis in question in this case did not involve compulsion to these ends.

> "It could not be denied that in requiring petitioner to submit to the withdrawal and chemical analysis of his blood the State compelled him to submit to an attempt to discover evidence that might be used to prosecute him for a criminal offense. He submitted only after the police officer rejected his objection and directed the physician to proceed. The officer's direction to the physician to administer the test over petitioner's objection constituted compulsion for the purposes of the privilege. The critical question, then, is whether petitioner was thus compelled 'to be a witness against himself.'

> . . . . .

> "It is clear that the protection of the privilege reaches an accused's communications, whatever form they might take, and the compulsion of responses which are also communications, for example, compliance with a subpoena to produce one's papers. *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746. On the other hand, both federal and state courts have usually held that it offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture. *The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling 'communications' or 'testimony,' but that compulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate it.*

> "Although we agree that this distinction is a helpful framework for analysis, we are not to be understood to agree with past applications in all instances. There will be many cases in which such a distinction is not readily drawn. Some tests seemingly directed to obtain 'physical evidence,' for example, lie detector tests measuring changes in body function during interrogation, may actually be directed to eliciting responses which are essentially testimonial. To compel a person to submit to testing in which an effort will be made to determine his guilt or innocence on the basis of physiological responses, whether willed or not, is to evoke the spirit and history of the Fifth Amendment. Such situations call to mind the principle that the protection of the privilege 'is as broad as the mischief against which it seeks to guard.' *Counselman v. Hitchcock*, 142 U.S. 547, 562, 12 S.Ct. 195, 198 [35 L.Ed. 1110].

> "In the present case, however, no such problem of application is presented. Not even a shadow of testimonial compulsion upon or enforced communication by the accused was involved either in the extraction or in the chemical analysis. Petitioner's testimonial capacities were in no way implicated; indeed, his participation, except as a donor, was irrelevant to the results of the test, which depend on

chemical analysis and on that alone. Since the blood test evidence, although an incriminating product of compulsion, was neither petitioner's testimony nor evidence relating to some communicative act or writing by the petitioner, it was not inadmissible on privilege grounds." [Emphasis added.]

In applying the approach outlined in *Schmerber, supra,* the United States Supreme Court has held that the privilege against self-incrimination does not extend to compelling participation in a lineup, *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); compelling the accused to provide handwriting exemplars, *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), and *United States v. Mara,* 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973); compelling a witness before the grand jury to submit voice exemplars, *United States v. Dioniso,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); or compelling an accused to permit the taking of fingernail scrapings, *Cupp v. Murphy,* 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973). And in *Warden, Maryland Penitentiary v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), the United States Supreme Court held that items of clothing seized in a "hot pursuit" search were not "testimonial" or "communicative" in nature, concluding that there was therefore no Fifth Amendment violation by the police seizure of the clothing.

 In the instant case, Metzner's boots were seized by the police officer while Metzner was being questioned at the door to his home. There is no evidence that Metzner was compelled to produce the boots. However, even if Metzner had been compelled to furnish the boots in question to the police, we conclude that there was no violation of his Fifth Amendment protection against self-incrimination. Like the situations outlined above, the boots were not testimonial or communicative in nature, but rather were "real evidence" which, if incriminating, were not incriminating because of Metzner's testimonial capacities. Like the blood donor in *Schmerber, supra,*

Metzner's participation, except for furnishing the boots, was irrelevant to the results of the comparison with the footprints. We therefore conclude that no violation of Metzner's Fifth Amendment privilege against self-incrimination occurred.

## SIXTH AMENDMENT ISSUE

 Metzner's final contention is that he was denied his Sixth Amendment right to the effective assistance of counsel.

In our recent decision in *State v. McKay,* 234 N.W.2d 853 (N.D.1975), we reviewed the status of the law with respect to this issue, stating, in 234 N.W.2d at 856–857:

"The right to effective counsel at trial is granted by the Sixth Amendment of the United States Constitution, and applies to State courts through the Fourteenth Amendment of the United States Constitution. *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

"Lack of counsel at trial will render a judgment void and require reversal of a conviction. *State v. Magrum,* 76 N.D. 527, 38 N.W.2d 358 (1949).

"Ineffective, incompetent, or inadequate representation is the same as no counsel at all, and, as such, will equal a denial of due process. *State v. Keller,* 57 N.D. 645, 223 N.W. 698 (1929).

"This court in *State v. Bragg,* 221 N.W.2d 793 (N.D.1974), set the following standard, as stated in *West v. State of Louisiana,* 478 F.2d 1026, 1033 (5th Cir. 1973):

" 'We interpret the right to counsel as the right to effective counsel. We interpret counsel to mean not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render and rendering reasonably effective assistance.'

"Defendant points to discrepancies in the testimony which counsel failed to object to or to probe into, and claims these affected his decision to plead guilty. The fact that counsel did not object to the introduction and admission of several items of evidence does not show incompe-

tency. Under the circumstances it could have been considered good strategy. As the State pointed out in its brief, one of the purposes of the hearing was to present evidence for the benefit of the defendant. In such a situation, counsel for the defendant is concerned with discovering as much of the State's case as he can. Objections to testimony would not serve any purpose. Counsel can better determine the strength of the State's case by letting it present everything it has. After the presentation he can evaluate the evidence and inform his client what the best course would be. Counsel's decision in this situation not to object to the discrepancies in the testimony does not constitute a showing that defendant has been deprived of effective counsel.

"Counsel is presumed to be competent and adequate and the burden of proof to show inadequacy or incompetency of counsel lies upon the defendant. *State v. Berger*, 148 N.W.2d 331 (N.D.1966). Defendant has not met that burden."

Furthermore, in *McKay, supra*, 234 N.W.2d at 855, we held in paragraphs 1 and 4 of the syllabus, that:

"1. The right to counsel guaranteed by the Sixth Amendment of the United States Constitution does not mean errorless counsel nor counsel judged ineffective by hindsight, but counsel reasonably likely to render, and rendering, reasonably effective assistance.

"4. Counsel is presumed to be competent and adequate and the burden of proof to show inadequacy or incompetency of counsel lies upon the defendant."

 In arguing that trial counsel rendered ineffective assistance, Metzner appears to contend that the failure to obtain the exclusion of evidence relating to the seizure of his boots was the fault of his counsel. We do not agree. Counsel for Metzner moved to suppress such evidence, and vigorously argued for such suppression at the hearing called on such motion. The trial court denied such motion. Furthermore, Metzner's counsel objected to the admission of such evidence at Metzner's trial, and the district court reaffirmed its oral denial of Metzner's motion to suppress evidence.[5] Our examination of the record shows that counsel did all that he could to present the issue squarely before the district court. As we have discussed earlier in this opinion, the district court's decision to admit such evidence was proper, and we see no way in which Metzner's counsel can be faulted for the district court's determination that the boots and the testimony relating thereto was admissible at trial.

Metzner also appears to claim that counsel failed to properly investigate the case before trial. However, Metzner presented nothing but a generalized statement that his constitutional rights were violated because of counsel's ineffectiveness. Metzner has therefore failed to sustain his burden of

5. There is some confusion about whether or not counsel for Metzner properly objected to the admission into evidence of testimony relating to the seizure of the boots. While it appears that counsel did not object to specific questions which were asked the State's witnesses, the following colloquy took place between counsel for Metzner and the court during the course of the trial:

"MR. RISKEDAHL: Your Honor, I wish to make the objection that was made in the pretrial hearing to the evidence which the State wishes to introduce. I wish to object to the admission of evidence which, we contend, was unlawfully seized, which, I believe, the State intends to introduce in its next witness or the next two witnesses. I just want to have that continuing objection on the record, your Honor.

"THE COURT: What is the evidence?

"MR. RISKEDAHL: It has to do with the boots and footprints that were followed from Lauer's Body Shop.

"THE COURT: That was your suppression motion.

"MR. RISKEDAHL: That is correct. I am just reaffirming it.

"THE COURT: Renewing your motion, which is denied.

"MR. RISKEDAHL: Objecting to any of this evidence which has to do with the boots and the footprints that were followed.

"THE COURT: Well, there is nothing to object to right now.

"MR. RISKEDAHL: Okay."

We deem such action by Metzner's attorney to be sufficient to preserve for review on appeal his claim that the evidence was inadmissible.

showing that there was a failure to investigate.

The motion to dismiss the appeal is therefore granted.

ERICKSTAD, C. J., and PAULSON, VOGEL, PEDERSON and SAND, JJ., concur.