STATE of North Dakota, Plaintiff
and Appellee,

v.

Alton J. ABRAHAMSON, Defendant
and Appellant.

Crim. No. 800.

Supreme Court of North Dakota.

Dec. 17, 1982.

David Garcia, Devils Lake, for defendant and appellant.

Joseph Dietchman, State's Atty., Minnewaukan, for plaintiff and appellee State of North Dakota; no brief or appearance.

VANDE WALLE, Justice.

This is an appeal from Alton J. Abrahamson's conviction by a jury for operating a motor vehicle while under the influence of intoxicating liquor in violation of Section 39–08–01, N.D.C.C. Abrahamson contends the trial court erred by denying his motion to suppress chemical-analysis evidence showing the amount of alcohol in his blood, by denying his objection to testimony by a State's witness that he admitted he was driving the vehicle, and by denying his motion for a mistrial. We affirm Abrahamson's conviction.

Abrahamson farms near Maddock, North Dakota. On a Saturday night in July of 1981 Abrahamson left home at 11:30 p.m. to attend a party at another farm near Maddock. Abrahamson drank at least five beers while at the party. He left for home at 4 a.m.

As Abrahamson approached and tried to turn at a "T" intersection the pickup he was driving slid off the gravel road and turned on its side. Abrahamson alleges his brakes failed to work properly. Abrahamson climbed out of the vehicle and was picked up by a friend who had left the same party. He was taken to the Harvey hospital where he received eight or nine stitches for a laceration.

Around 4:30 a.m. on Sunday, the Maddock police notified the Benson County sheriff's office of the one-vehicle accident. Officer Deck, a Benson County deputy sheriff, went to the accident scene to investigate. Abrahamson had already left the scene. At Officer Deck's request, the Harvey police chief, Officer Hoffer, went to the hospital to see Abrahamson. Officer Hoffer noticed that Abrahamson smelled of liquor, but he noticed no other indication of intoxication. Officer Hoffer asked Abrahamson to submit to a blood-alcohol test and he agreed. Abrahamson was told there would be "possible charges," but he was not arrested.

Officer Hoffer told Abrahamson he would lose his driver's license if he refused to submit to the test. After Abrahamson signed a hospital consent form, a registered nurse drew the blood according to normal hospital procedures. The sample was sent to the State Laboratory. A chemist employed by the State testified that Abrahamson's blood-alcohol content was .15 percent, or .05 percent greater than the legal limit.

At 9 a.m. on Sunday, Abrahamson called the sheriff's office for permission to move his vehicle. On the following Tuesday or Wednesday night, Officer Deck went to Abrahamson's farm at his request to fill out an accident-report form. Abrahamson told the officer he was driving the vehicle during the accident. After completing the form, Officer Deck issued Abrahamson a ticket for driving while under the influence of intoxicating liquor. Officer Deck testified at trial that she issued the ticket because she knew Abrahamson owned the vehicle, the vehicle had come from the direction of a party, the tracks were on the wrong side of the road, and the vehicle was involved in the one-vehicle rollover.

Before the trial, Abrahamson moved to suppress the results of the blood-alcohol test and his admission that he was driving

the vehicle. After the noon recess, Abrahamson moved for a mistrial based upon the conduct of the judge and the prosecutor during lunch. All these motions were denied. Abrahamson now contends each denial by the trial judge was error.[1]

The first issue raised by Abrahamson involves the court's denial of his motion to suppress evidence of the amount of alcohol in his blood as shown by chemical analysis. Abrahamson makes three arguments in his attempt to show that the trial court erred.

His first argument is that the evidence should have been suppressed because the test was administered before he was arrested, contrary to Section 39–20–01, N.D.C.C. Section 39–20–01, the "implied consent" statute, states:

"Any person who operates a motor vehicle upon the public highways of this state shall be deemed to have given consent subject to the provisions of this chapter to a chemical test, or tests, of his blood, ... for the purpose of determining the alcoholic content of his blood. The test or tests shall be administered at the direction of a law enforcement officer only after placing such person ... under arrest and informing him that he is or will be charged with the offense of driving or being in actual physical control of a vehicle upon the public highways while under the influence of intoxicating liquor...."

■ The trial judge correctly determined that this implied-consent statute was inapplicable because Abrahamson actually consented to the taking of the blood test. In *Wanna v. Miller*, 136 N.W.2d 563 (N.D. 1965), this court determined that Chapter 39–20, N.D.C.C., does not apply when a person voluntarily submits to the extraction of the blood specimen.

Proceedings under Chapter 39–20 are civil in nature. "The purpose of the implied consent law is to discourage individuals from driving an automobile while under the influence of intoxicants; to revoke the driving privileges of those persons who do drive while intoxicated; and to provide an efficient means of gathering reliable evidence of intoxication or nonintoxication." *Hammeren v. North Dakota State Highway Comr.*, 315 N.W.2d 679, 681 (N.D.1982), quoting *Asbridge v. North Dakota State Highway Comr.*, 291 N.W.2d 739, 750 (N.D. 1980). The proceedings under Chapter 39–20 are separate and distinct from criminal proceedings. The implied-consent statute and Section 39–20–04, N.D.C.C., pertain to a person's refusal to take a blood-alcohol test after he has been arrested and the resulting revocation of his driver's license,

1. We note that the State's Attorney for Benson County did not file a brief or appear before this court at oral argument or inform this court of the reasons for his failure to do so. As a result, we can only speculate as to his positions on the issues raised by the defendant. Under the North Dakota Rules of Appellate Procedure there is no penalty for the appellee's failure to file a brief except for loss of an opportunity to be heard at oral argument. N.D.R.App.P. 31(c). Accord, *State v. Michaels*, 543 S.W.2d 245 (Mo.App.1976).

However, failure to file an appellee's brief has repeatedly been condemned by the courts. See *Imperial Point Col. v. Freedom Prop. Intern.*, 349 So.2d 1194 (Fla.App.1977); *Bowman v. Bowman*, 318 So.2d 186 (Fla.App.1975); *Elam v. State*, 125 Ga.App. 427, 187 S.E.2d 920 (1972); *People ex rel. Ryan v. Coles*, 64 Ill. App.3d 807, 21 Ill.Dec. 543, 381 N.E.2d 990 (1978); *People v. Vandever*, 79 Ill.App.2d 97, 223 N.E.2d 273 (1967); *Michaels, supra; People v. Jackson*, 73 A.D.2d 1060, 425 N.Y.S.2d 408 (1980); *People v. Pacella*, 47 A.D.2d 711,

364 N.Y.S.2d 258 (1975); *Commonwealth v. Oliver*, 479 Pa. 147, 387 A.2d 1266 (1978). We believe a brief should be filed even in those instances in which the attorney believes the appeal to be totally without merit.

An appellate court does not serve as both a judge and an advocate for the appellee. *Coles, supra.* The failure of the State's Attorney to file a brief places an undue burden on this court. *Imperial Point, supra.* In 1897 the Florida Supreme Court aptly stated:

"We think a moment's reflection on the part of members of the profession will convince them that their duty to this court, their clients, and the state requires that in all cases here represented by them they should brief the questions involved on appeal, not only because it may aid to secure a just and correct decision of these questions, but because this court is thereby enabled to dispose of its business more rapidly than it otherwise could do." *Chamberlain v. Lesley*, 39 Fla. 452, 456–457, 22 So. 736, 737 (1897).

not the admissibility of such evidence in a criminal trial. The judge correctly determined that Section 39–20–01 was inapplicable in this action.

Abrahamson's second argument is that his voluntary consent to the blood test is vitiated because he was deceived by the law-enforcement officer. The officer told Abrahamson he would lose his driver's license if he refused to submit to the blood test. Abrahamson stated he based his consent upon this warning.[2]

The extraction of a blood sample to determine blood-alcohol content is a "search" within the meaning of the Fourth Amendment. *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). The Fourth Amendment's function is to constrain against compelled intrusions into the body which are made in an improper manner or which are not justified in the circumstances. *Schmerber, supra.*

Extraction of blood samples for testing is commonplace and for most people involves little risk, trauma, or pain. The quantity of blood extracted is minimal and the sample can effectively be used to determine the degree to which a person is under the influence of alcohol. *Schmerber, supra.* The record in the instant case shows that the sample taken from Abrahamson was taken in a reasonable manner. A registered nurse took the blood sample in the hospital according to accepted medical practices.

■ Because the taking of a blood sample is a search, the police officer needs to be justified in his request by obtaining a search warrant or meeting an exception to the search-warrant requirement. See *State v. Matthews,* 216 N.W.2d 90 (N.D.1974). One of the exceptions to the warrant requirement is that the person consent to the search. *State v. Swenningson,* 297 N.W.2d 405 (N.D.1980).

The Fourth Amendment requires that consent to a search be voluntary. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *State v. Page,* 277 N.W.2d 112 (N.D.1979). To determine what constitutes "voluntary consent" we consider the totality of the circumstances. *State v. Metzner,* 244 N.W.2d 215 (N.D. 1976). In the instant case the police officer's statement may have led Abrahamson to mistakenly believe he would lose his driver's license if he refused to consent to the blood-alcohol test. Although the officer probably did not intentionally try to deceive Abrahamson, the result may have been the same. This misleading statement by the officer is one factor to be considered in determining the voluntariness of Abrahamson's consent.

In *State v. Hall,* 297 N.W.2d 80 (Iowa 1980), *cert. denied* 450 U.S. 927, 101 S.Ct. 1384, 67 L.Ed.2d 359 (1981), the defendant claimed trickery was used to obtain his consent for withdrawal of body specimens. The defendant asked a police officer if the victim had died. The officer replied that he did not know, when in fact he did know she was dead. The Iowa court stated that devious activity by authorities is one of the circumstances relevant to the issue of voluntariness. The Iowa court cited an earlier case disapproving of deception by representatives of the State, but stated that deception alone did not render the consent involuntary unless the deceiving act amounted to a deprivation of due process. The Iowa court concluded that "this deception did in fact occur, but we consider it only as part of the totality of circumstances in determining voluntariness; it is insufficient alone to vitiate the consent." *Hall, supra,* 297 N.W.2d at 89.

■ In the case at hand we cannot say that the police officer's behavior was "devious," and we do not condone practices by

---

**2.** In fact, the warning given to Abrahamson by the officer was meaningless because the officer did not follow the requirements of the implied-consent statute. Before a driver may lose his license for refusing to take a blood test, he must have been placed under arrest and informed that he is or will be charged with the offense of driving while under the influence of alcohol. Sec. 39–20–01, N.D.C.C.; *Colling v. Hjelle,* 125 N.W.2d 453 (N.D.1963). Abrahamson was not arrested until two days after the blood sample was taken. Therefore, he could not have lost his license for noncompliance with the implied-consent law.

State law-enforcement officers which may deceive criminal suspects. The alleged deception is the only issue raised by Abrahamson in his attempt to show his consent was not voluntary. During cross-examination the State's Attorney questioned Abrahamson regarding the blood test as follows:

"Q. ... Did somebody ask you to take the test?

"A. Yes.

"Q. Did he threaten you with anything?

"A. He read through and said failure to comply will, you will lose your driver's license for a period of 6 months.

"Q. Did he tell you you had the right to refuse?

"A. Yes.

"Q. Did you refuse?

"A. No.

"Q. You went along with the test?

"A. Yes."

Abrahamson was fully conscious when he agreed to the taking of the blood sample. Although he was misinformed regarding the possible loss of his driver's license, Abrahamson did not testify that he would have refused the test but for the officer's statement. After considering the totality of the circumstances, we believe that the misleading statement made by the police officer alone is insufficient to vitiate Abrahamson's consent to the blood-alcohol test.

Abrahamson's final argument involving the taking of the blood-alcohol test is that the trial judge made an incomplete inquiry into his motion to suppress the test results and incorrectly shifted the burden of proving he did not voluntarily consent to the test.

Abrahamson's written motion to suppress is based upon the following reason, "that the test of his blood was administered at the direction of a law enforcement officer before the defendant was placed under arrest by another law enforcement officer, all contrary to 39–20–04 NDCC, ..." We note that the argument to this court went beyond that stated in the motion to include the alleged misconduct of the police officer.

As we stated above, Section 39–20–04 involves civil administrative remedies for refusal to take a blood-alcohol test and does not directly affect the admissibility of the blood-test evidence.

█ The central issue at the suppression hearing should have been the consent exception to the Fourth Amendment search-warrant requirement. When the defendant asserts a violation of the Fourth Amendment search provisions, the burden of proof on a motion to suppress is on the State. *State v. Klodt,* 298 N.W.2d 783 (N.D.1980); *State v. Matthews, supra.* Here, the State had the initial burden of proving Abrahamson voluntarily consented to the test. Although the record is far from clear, it appears the State met this burden by showing that Abrahamson did not refuse the test and that he signed a consent form provided by the hospital.

All the evidence presented at the suppression hearing consisted of oral arguments from counsel for the State and the defense. Both sides lacked testimony and other evidence to present to the judge for consideration. After the State explained that Abrahamson consented to the blood test, the judge stated: "[T]he implied consent provision is not going to come into effect until the issue [of whether or not there was consent] arises ... based upon the hearing here today the Court can only assume then, unless defense counsel would request a hearing on that issue, that consent was given ..."

█ The trial court properly shifted the burden of proof to the defense to allow Abrahamson to explain that although he signed a consent form, he did so because of misleading advice from the police officer. This burden could easily have been met through testimony by Abrahamson or the police officer at the suppression hearing. However, Abrahamson's counsel stated at the hearing, "We stand upon our motion ..." Without production of evidence of the alleged involuntary consent, the trial court correctly denied the motion to suppress. We note that during trial when the police officer testified, "I told him that he

didn't have to take the test, but along with not taking the test he would have an automatic suspension of his driver's license for six months for his refusal," Abrahamson did not renew his objection to the admission of the blood-test results.

The second issue raised by Abrahamson is whether or not the trial judge erred in denying his objection to testimony by a police officer that he admitted he was driving the motor vehicle, as the admission was given to the officer before he received the *Miranda* warnings. Two days after the accident Officer Deck went to Abrahamson's farm home to obtain information for an accident-report form. Abrahamson had not been arrested and he was not given any *Miranda* warnings. Officer Deck asked Abrahamson if he was the driver of the vehicle and he admitted he was. After filling out the accident-report form, Officer Deck wrote a ticket charging Abrahamson with driving while under the influence of intoxicating beverages.

The recent case of *State v. Fields,* 294 N.W.2d 404 (N.D.1980), deals directly with the issue of *Miranda* warnings and information-gathering for accident reports. In *Fields* the police officer went to the hospital to obtain information to complete an accident-report form and to issue Fields a citation for driving while under the influence of intoxicating liquor. The officer did not give Fields *Miranda* warnings before asking him if he was driving the vehicle involved in the accident.

We determined in *Fields* that the officer was not required to give *Miranda* warnings before the questioning because Fields was not in police custody. "Mere investigatory focus does not require the giving of the *Miranda* warnings." *Fields, supra,* 294 N.W.2d at 406. Fields was not in "custody" while he was in the hospital. Therefore, the failure to advise Fields of his *Miranda* rights prior to asking him if he was the driver of the car did not make his answer inadmissible.

■ Similarly, in the instant case Abrahamson was not in custody when questioned by Officer Deck. The officer drove to the farm where Abrahamson lived with his parents for the purpose of completing the accident-report form. The questioning was done outside while Abrahamson showed the officer the damage to his vehicle. *Miranda* warnings were not necessary before the investigatory questioning. The trial judge correctly denied Abrahamson's motion to suppress his admission.

■ Abrahamson also argues that Section 39–08–14, N.D.C.C., prohibited the introduction into evidence at trial of his admission that he was driving the vehicle. Subsection 1 of Section 39–08–14 provides that "[a]ll accident reports made by persons involved in accidents ... shall be without prejudice to the individual so reporting ..." In the instant case the accident report itself did not prejudice Abrahamson because it was not introduced as evidence during the trial. During cross-examination the State's Attorney asked Abrahamson if he denied that he was driving the vehicle involved in the accident. Abrahamson replied, "No."

In addition to Abrahamson's testimony, his conduct and the testimony of others made it obvious Abrahamson was driving the vehicle. One of Abrahamson's friends testified that he stopped at the scene of the accident shortly after it occurred and took Abrahamson to the hospital. The morning after the accident Abrahamson called the Minnewaukan sheriff's office to get permission to remove his car from the ditch. The trial judge correctly determined that Abrahamson's admission that he was driving was not prohibited at trial by Section 39–08–14.

The third issue raised by Abrahamson is whether or not the trial court erred in denying his motion for a mistrial on the ground of prejudice to him arising from the conduct of the trial judge and the prosecutor. Abrahamson moved for a mistrial immediately after the noon recess on the basis of the situation at the local restaurant during the recess. The judge, the clerk of court, and the prosecutor ate together, at a table next to one where five jurors were seated. After the noon meal, the judge and

the prosecutor played a game of gin rummy within the sight and hearing of the jurors. Abrahamson and his attorney sat in the back of the restaurant. Abrahamson alleged the totality of these circumstances raised an undue prejudice in the jurors' minds that the court had a favorable view of the prosecutor and his case.

The prosecutor responded to the motion during a conference in the judge's chambers by stating that he sat at the only seat available in the only restaurant in town and that the Abrahamson case was not discussed. The judge denied Abrahamson's motion for a mistrial because there was no ex parte communication concerning the case and because he believed the incident presented no prejudicial appearance against the defendant to the jurors.

A trial judge has great influence over lay jurors. *Fortier v. Ritter's Hairdressing Studios, Inc.*, 282 Minn. 382, 164 N.W.2d 897 (1969). The judge should maintain an impartial attitude, and "[h]e should not . . . by any conduct on his part, do anything which may influence the jury in its consideration of the case." *Haugen v. Mid-State Aviation, Inc.*, 144 N.W.2d 692, 696 (N.D.1966).

■ When irregularities occur during a trial, the party affected must bring the problem to the court's attention when the irregularities occur so that the court may take appropriate remedial action. *State v. Bragg*, 221 N.W.2d 793 (N.D.1974). In the instant case Abrahamson did so by moving for a mistrial immediately after the noon recess. In *State v. Berger*, 235 N.W.2d 254, 259 (N.D.1975), *cert. denied* 425 U.S. 913, 96 S.Ct. 1511, 47 L.Ed.2d 764 (1976), this court stated the general rule on mistrials as follows: "[A] trial judge properly exercises his discretion to declare a mistrial if an impartial verdict cannot be reached, or if a verdict of conviction could be reached but would have to be reversed on appeal due to an obvious procedural error in the trial."

■ The granting of a mistrial is an extreme remedy which voids all proceedings in the case up to that time. *State v. Tjaden*, 69 N.W.2d 272 (N.D.1955); *State v.*

*Braathen*, 77 N.D. 309, 43 N.W.2d 202 (1950). The trial judge has great discretion in the denial of a mistrial. His decision will not be reversed on appeal unless there is a manifest injustice. *Tjaden, supra.* In the instant case we do not believe the trial court's denial of the motion for a mistrial was error. The incident during the noon recess at the restaurant did not make it evident that further proceedings would result in manifest injustice.

However, we do not condone the conduct of the trial judge and the prosecutor. Because there was only one restaurant in town and it was crowded, we realize that the prosecutor and the judge may have been forced by circumstances to eat together. But the friendly game of cards that followed the meal in the sight of the jury might have had the appearance of impropriety. Both the judge and the prosecutor should have been aware of this danger and should have avoided it. A prosecutor shares in the duty of ensuring that a criminal defendant receives a fair trial. *State v. Bragg, supra.*

A Texas appellate court considered a similar problem in a civil setting when during a recess from trial the appellee's attorney ate with the judge in the restaurant in which the jurors were eating. The court's comments are equally applicable in the instant case:

"It is understandable that litigants, seeing their opponent's attorney apparently fraternizing with the judge, might feel that they were at a disadvantage in the trial, no matter how innocent in fact the conduct complained of may have been. . . . We cannot say that the jury was probably influenced against appellants by the incident. However, attorneys should be quite circumspect in their relations with a judge during a trial, carefully avoiding the least semblance of personal friendship or familiarity which could possibly be misunderstood by the jury; . . ." *Flora v. Scott*, 398 S.W.2d 627, 632 (Tex.Civ.App.1965).

We have considered Abrahamson's contentions that the trial court erred in admit-

ting into evidence the results of the blood-alcohol test and his admission that he was driving, and in denying his motion for a mistrial. Although Abrahamson raised valid issues, we do not believe the trial judge erred in his rulings. The conviction for driving while under the influence of intoxicating liquor is affirmed.

ERICKSTAD, C.J., and PEDERSON, PAULSON and SAND, JJ., concur.