STATE of North Dakota, Plaintiff and Appellee,

v.

Damien David BREDING, Defendant and Appellant.

Cr. No. 940038.

Supreme Court of North Dakota.

Jan. 19, 1995.

Richard C. Wilkes, State's Atty., Kenmare, for plaintiff and appellee.

Carl O. Flagstad, Jr., Minot, for defendant and appellant.

VANDE WALLE, Chief Justice.

Damien David Breding appealed from a criminal judgment entered on jury verdicts finding him guilty of two counts of murder and one count of attempted murder, and from an order denying his motion for a new trial. We affirm.

During the early Easter morning hours of March 31, 1991, six-year old twins Jennifer and Jessica Peterson died, and their father, Bradley Peterson, was injured, in a fire that occurred at the Peterson residence in Powers Lake. The twins' babysitter the previous evening, Breding, age 16 at the time of the fire, was subsequently charged with two counts of murder and one count of attempted murder. *See* N.D.C.C. §§ 12.1–06–01, 12.1–16–01(1)(c), and 12.1–21–01. The proceedings were transferred from juvenile court to district court.

After several unsuccessful attempts to change venue, a trial was held in Burke County and the jury found Breding guilty on all counts. The trial court denied Breding's

motion for a new trial. Breding in his appeal from the convictions and from the order denying his motion for a new trial, alleges that the trial court erred in denying his motions for change of venue; that the jury's verdicts were not supported by the evidence; and that prosecutorial and juror misconduct warranted a new trial.

I

Breding made several pretrial motions relating to venue. The trial court granted Breding's request to conduct a public opinion poll at State expense and deferred ruling on his motion for change of venue until the poll was completed.

The poll was conducted by Harry Hoffman, Ph.D., of the Bureau for Social and Behavorial Research at Minot State University. The results of the poll indicated that, after eliminating people who either had moved, were too old, were deceased, or were living in Powers Lake, 988 persons were available for jury duty in Burke County. Of the 95 persons polled, "at least 50 percent of the sample learned of the case through 'word of Mouth,' 'Newspaper,' accounts or both (15.8%, 26.3% and 15.8% respectively)." The report also said:

"In terms of having formed an opinion about the case, almost one-half of the respondents (48.4%) indicate that they have not, while 25.3 percent state that they did. Further, 20 percent of the respondents were unwilling to comment on this question. Focusing on the nature of the opinion, slightly over 20 percent (21.1%) feel that Damien Breding is guilty, while 2.1% assume him innocent. Over 65 percent (67.4%) would not comment. Although slightly over one-third of the sample has formed some type of opinion, 51.6 percent still believe they could listen to the evidence and draw an independent decision.

"The question as to whether or not Damien Breding could receive a fair trial in Burke County is addressed next. Approximately one-quarter of the sample believe a fair trial can be conducted within Burke County. However, almost 35 percent (34.7%) feel a fair trial would not be possible in Burke County. Also of impor-

tance are the percent of individuals who[ ] are unsure (36.9%)."

The trial court denied the motion for change of venue, reasoning that "while some people have formed an opinion of guilty in this case, there still remains sufficient numbers of people in Burke county who are without opinion and willing to listen to the evidence and give the defendant a fair trial." The court noted that "inquiry of potential jurors in small groups during the voi[r] dire process" would be required.

Voir dire consumed more than two days and involved more than 90 potential jurors. The court questioned potential jurors in small groups and questions were asked about strongly held opinions of guilt or innocence and any prior knowledge of the case. Some potential jurors said they had opinions regarding the case, or that they knew witnesses who were going to testify. These persons were questioned individually and at length by the court and both counsel about their knowledge or opinions and how it would affect their decision. When defense counsel requested removal for cause, the prosecutor did not object. More than 20 persons, including many from Powers Lake, were dismissed for cause based on their direct knowledge of the case. More than 20 others were dismissed for cause based on medical reasons, economic hardship, prior business with the attorneys, and a lack of belief in the presumption of innocence.

Forty-four persons remained after completion of voir dire. The trial court later excused two persons for medical-related reasons and five others because they were needed for farm work to complete harvest. With 37 persons remaining, each side was allowed 12 peremptory challenges, leaving a 12–member jury with one alternate juror. Defense counsel did not renew his motion for change of venue after the jury was chosen, but did assert the trial court's earlier refusals to grant the motions as a ground for a new trial.

Breding asserts that the trial court committed reversible error in refusing to change venue. We disagree.

■ Rule 21(a), N.D.R.Crim.P., provides:

"*(a) For Prejudice in the County or Municipality.* The court upon motion of the defendant shall transfer the proceeding as to that defendant to another county or municipality whether or not that county or municipality is specified in the defendant's motion if the court is satisfied that there exists in the county or municipality in which the prosecution is pending so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial."

A motion for change of venue is addressed to the sound discretion of the trial court, whose decision will not be reversed on appeal absent a showing of abuse of discretion prejudicial to the defendant. *State v. Purdy,* 491 N.W.2d 402 (N.D.1992). While there are some cases in which prejudice to the defendant is so clear that a change of venue should be ordered promptly, generally voir dire examination is an appropriate occasion to determine whether it is possible to select a fair and impartial jury. *State v. Norman,* 507 N.W.2d 522 (N.D.1993). Here it was the appropriate time.

Breding asserts that a change of venue should have been granted, not primarily because of pretrial publicity by the media, but because of "the type of publicity small community living generates as a matter of course, i.e. rumor, gossip and speculation." Breding also relies on the severity of the charges against him, the voir dire itself, and the poll results, which he claims were rendered invalid by excluding Powers Lake residents as potential jurors.

The failure to renew a motion for change of venue after voir dire is viewed by some courts as an "'apparently deliberate waiver.'" *See Wylie v. State,* 797 P.2d 651 (Alaska App.1990) (quoting *Mallott v. State,* 608 P.2d 737, 748 (Alaska 1980)). We do not rely on any waiver theory here, however. *See Norman, supra.* The trial court considered the change of venue issue in its order denying the motion for new trial, and we agree with the court that there was little likelihood of hidden prejudice in the impaneled jury.

■ Just as knowledge obtained by jurors from common gossip will not automatically disqualify a juror, *State v. Olson,* 290 N.W.2d 664 (N.D.1980), generalities about small town gossip do not sufficiently support a motion for change of venue. *State v. Engel,* 289 N.W.2d 204 (N.D.1980). *See also Copeland v. State,* 457 So.2d 1012 (Fla.1984), *cert. denied,* 471 U.S. 1030, 105 S.Ct. 2051, 85 L.Ed.2d 324 (1985); *State v. Petersen,* 515 N.W.2d 687 (S.D.1994); *State v. Gellatly,* 22 Utah 2d 149, 449 P.2d 993 (1969). Although the crimes charged were serious, counsel were permitted extensive inquiry into the existence of actual bias toward Breding and whether potential jurors could set aside information, if any, which they had heard about the case. Breding acknowledges that the media reports on the case were not "unusual" considering the severity of the charges and has not pointed us to anything sensational about them. No one from Powers Lake, presumably where most of the gossip occurred, sat on the jury. Even if people from Powers Lake should have been included in the poll, we agree with the State that the results of the poll provided a more realistic view of the people available in Burke County who could reasonably be assumed to be acceptable to sit on the jury.

■ Breding's argument is essentially that the rumor, gossip, and speculation "small community living generates as a matter of course" should have been sufficient alone to support his motion. However, if we were to accept this argument, a change of venue would be required in every serious criminal prosecution in a rural, sparsely-populated county. This is not the law.

In *Slaubaugh v. Slaubaugh,* 499 N.W.2d 99 (N.D.1993), we affirmed the trial court's decision to change venue in a civil case based on relationships among the prospective jurors, litigants, and witnesses and the cumulative effect of those connections. We said:

"Juries, rather than individual jurors, decide cases, and jury decisions are not rendered in a vacuum. Consequently, determining whether a fair and impartial trial can be had in a particular location requires an analysis of the jury as a whole and of the community where the trial is to be

held. This process allows a trial court to consider the aggregate effect of many factors."

*Slaubaugh, supra,* 499 N.W.2d at 106.

■■■ The trial judge, who is present in the county and is presumed to know the situation, is in a much better position than we are to pass on general claims of prejudicial community gossip and its effect on a defendant's right to a fair trial before an impartial jury. The trial court determined that a fair and impartial jury could be obtained in Burke County. A trial court abuses its discretion when it acts in an arbitrary, unreasonable, or unconscionable manner. *State v. Schuh,* 496 N.W.2d 41 (N.D.1993). A decision is not arbitrary, capricious, nor unreasonable if the exercise of discretion is the product of a rational mental process by which the facts and the law relied upon are considered together for the purpose of achieving a reasoned and reasonable interpretation. *State v. Daulton,* 518 N.W.2d 719 (N.D.1994). Our review of the record gives us no cause to conclude that the trial court abused its discretion in denying Breding's motions for change of venue or in refusing to grant him a new trial on this basis.

## II

Breding asserts that the circumstantial evidence was insufficient to support the jury verdicts.

■■■ To successfully challenge the sufficiency of the evidence on appeal, a defendant must convince us that the evidence, when viewed in the light most favorable to the verdict, permits no reasonable inference of guilt. *State v. Lovejoy,* 464 N.W.2d 386 (N.D.1990). A verdict based on circumstantial evidence carries with it the same presumption of correctness as other verdicts, and will not be disturbed on appeal unless it is unwarranted. *State v. Raulston,* 475 N.W.2d 127 (N.D.1991). In the trial court, circumstantial evidence is weighed with the presumption of innocence, and must exclude any reasonable inference of innocence. *State v. Vallely,* 479 N.W.2d 480 (N.D.1992). On appeal, however, we determine only whether there is competent evidence that reasonably tends to prove guilt and fairly warrants the conviction. *State v. Carson,* 453 N.W.2d 485 (N.D.1990).

Viewing the evidence in the light most favorable to the verdicts, we believe the jury reasonably could have found the following facts. Bradley Peterson and his wife, Paula Peterson, and their daughters, Jennifer and Jessica, lived in a house they rented in Powers Lake. On Saturday evening, March 30, 1991, Paula, after making arrangements to have Breding babysit the girls later that night, left the home at 7 p.m. and drove to Tioga to meet another man. Bradley put the girls to bed at approximately 9 p.m. and watched television until a few minutes after 10 p.m., when Breding arrived to babysit. Bradley walked to a nearby bar and consumed six drinks before the bar closed at 1 a.m.

When he arrived home, Bradley told Breding he would not be paid for babysitting the girls until Monday, after Paula returned from Tioga. Breding then left the house. The girls were sleeping in a main floor bedroom and Bradley fell asleep in front of the living room television around 1:15 a.m. Although Bradley smoked cigarettes, he testified that he did not recall smoking a cigarette at home before he went to bed that night.

Bradley was awakened when he heard noises in the house.

> "Well, I remember hearing some kind of noise around the house and I must have been sleeping or something and sort of a creaking, floor creaking. I thought it must be out in the kitchen. Then I thought I heard a liquid pouring and the next thing I knew there was sort of a little explosion, a whoosh and that must have been what woke me up completely. Then I heard the backdoor slam to our house."

Bradley jumped up and noticed "[s]moke so thick I couldn't even breath or see anything at all in the house." Bradley "thought I heard one of my girls calling for help, so I yelled to them to run to me and I had tried to head in that direction, but my stocking on my foot started burning right when I took one step that way and the heat was too intense ... [and] I couldn't breath at all or

see anything." Bradley dropped to the floor and crawled to the front door, which he managed to open by beating on it, breaking his hand in the process.

Bradley ran across the street to the home of Daniel and Vicki Osterbrink and asked them to call the fire department. Bradley then went back to the house. While calling the fire department at approximately 2 a.m., Vicki looked out the window and saw Breding standing in the Peterson's front yard a few feet from the front door of the house. Vicki's teenage daughter, Bernadette Puckett, was Breding's classmate and, while looking out the same window, also saw Breding standing in the Peterson's front yard talking to her stepfather, Daniel. They had no trouble seeing Breding because the street was lighted and there was a full moon. Daniel, who had gone to the Peterson home to assist, testified that he met Breding on the way to the house, asked where the girls were, and Breding responded they were in bed. Breding pointed Daniel to the bedroom window where the girls had been sleeping. According to Vicki and Puckett, when the fire siren began to ring at 2:04 a.m., they observed Breding run south toward the fire hall.

Zeke Isakson, a volunteer fire fighter who arrived at the scene shortly after the call came in, entered the house with an air pack and other fire equipment and attempted to find the girls. After searching through the dark smoke, he located the girls who were taken to a waiting ambulance. According to Isakson, the fire was extraordinarily hot and the smoke was so thick that his flashlight would only penetrate six or seven inches into the darkness. After the girls were removed, the fire was extinguished with approximately 200 gallons of water. Despite continuing efforts by the ambulance crew to revive the girls, Jennifer and Jessica were pronounced dead at the Tioga hospital. Autopsies revealed that the girls died of carbon monoxide asphyxiation due to smoke inhalation.

Isakson believed the fire started on a cot in the living room because that was where most of the fire was contained. Because of the tremendous amount of heat and smoke generated by the relatively small fire, and the death of the two girls, Isakson notified the State Fire Marshall and requested assistance. Raymond Lambert, a deputy fire marshall, arrived at 6 a.m.

Tad Prichett, a Burke County Deputy Sheriff, arrived in Powers Lake at approximately 5 a.m., spoke with the Osterbrinks, took a written statement from them, and having been informed that they observed Breding at the fire, went to Breding's residence. When Prichett arrived between 5:30 and 6 a.m., he was met at the door by a person he believed to be Breding's stepfather, who called Breding down to the kitchen table. According to Prichett:

"I asked if he'd been babysitting that evening. And he said that he had been at the Peterson house. And I said, 'You know about the fire, the house burned down.' And he said, 'Yes.' And I said, 'You know the girls didn't survive the fire.' And he said, 'Yes, that's what I heard.' . . ."

Lambert investigated the fire and believed it was not accidental, but was deliberately set. On April 1, 1991, he and Deputy Sheriff William Loock interviewed Breding, who was accompanied by his mother, at the fire station. Breding told Lambert he arrived at the Peterson home at 10:06 p.m., the girls were sleeping when he arrived, they did not get up throughout the evening, and he left when Bradley came home at 1:30 a.m. Breding told Lambert that he went straight home and to bed, where he slept until awakened by Prichett later that morning. Breding also said he knew the area where the fire started and that one of the persons at the fire scene was "extremely drunk." When Lambert asked him how he knew these things, Breding said Larry Gullickson had subsequently told him about the fire.

Gullickson, a fire fighter who was at the scene, testified that he did not recall talking to Breding on either Easter Sunday or the following Monday. He said he knew Breding was at his house on Sunday, but if he did speak to him, "it was just a brief 'Hi.'"

On April 4 and 5, 1991, agents of the State Bureau of Criminal Investigation interviewed Breding, who was accompanied by his mother, at the fire department. Breding was advised of his rights and signed a rights

waiver form on both occasions. Breding denied setting the fire. During the April 5 interview, Breding again said that after babysitting he went directly home and to bed. After agent Dallas Carlson confronted him with the statements of people who had seen him at the fire, Breding "no longer denied being there, but he told us that he was probably walking in his sleep if he was there." In response to a question of what he thought would happen to him if he told the truth about the fire, Breding said "he was afraid of getting sent away." Breding then asked for an attorney, and questioning ceased.

Lambert, the prosecution's expert witness, testified that he believed the fire was set with the assistance of an accelerant. He testified that a discarded cigarette would have burned much slower and would not have generated the intense heat in the relatively short amount of time this fire burned. He testified that the origin of the fire was on a cot, that the fire "had dropped down to floor level and continued to burn with intensity very consistent with fire dropping down with presence of an accelerant." He testified a normal burning pattern would be in a "V" shape, but this pattern was not in a "V" shape which is also consistent with the presence of an accelerant. He noticed a very distinct "alligatoring" in the hard-wood floor and said that an accelerant would cause this effect. He estimated the fire started approximately 1:45 a.m., and burned about 15 minutes, dying down when fire fighters arrived. Although no liquid container for carrying an accelerant was found at or near the house, and laboratory analysis of material from the fire scene contained no evidence of liquid accelerant, Lambert testified the accelerant could have been totally consumed by the fire.

The major defense witness was John Woodland, an experienced fire investigator who conducted his investigation of the fire in September 1991. He agreed the fire started at the south end of the cot but concluded the fire could not have been set with a liquid accelerant, and found no evidence that a flammable liquid or accelerant was used. He said it was an accidental fire that could have started with smoking material. He found no

evidence that it was a particularly hot fire, but that it burned at normal temperatures. He said the reason for the black smoke was clothes burning on the cot as well as the carpet pad, which burned rapidly. He estimated the fire burned between 30 and 45 minutes.

The credibility of the experts was for the jury to decide. Breding gave witnesses inconsistent stories about his whereabouts at the time of the fire and made incriminating statements to investigators. Breding's counsel argued the unimportance of many of these items of evidence to the jury, and suggested the fire was started either by a cigarette discarded by an intoxicated Bradley, or by Paula because of the couple's failing marriage. The prosecution argued Breding was familiar with the layout of the house and suggested he set the fire because he was angered by not being paid immediately for his babysitting services.

We conclude that there was substantial circumstantial evidence reasonably tending to prove Breding's guilt. We likewise conclude that the trial court did not abuse its discretion in denying the motion for new trial on the ground that the verdicts were against the weight of the evidence. *See State v. Tranby*, 437 N.W.2d 817 (N.D.), *cert. denied*, 493 U.S. 841, 110 S.Ct. 128, 107 L.Ed.2d 88 (1989).

### III

Breding asserts that prosecutorial misconduct justifies a new trial because the prosecution instigated untruthful testimony from a key State witness. We disagree.

In support of his motion for a new trial, Breding submitted an affidavit by Gullickson, stating Gullickson "can't recall specifically whether or not I talked to Damien about the fire on Monday; ..." Gullickson further stated that before trial, he told the states attorney that "being I was up for such a long period of time at the fire scene that my memory was a little hazy about talking to Damien, and that I could not remember whether or not I talked to him, ..." Gullickson said the states attorney then told him, "when asked that question just say no."

The states attorney responded that at the juvenile court transfer hearing, Gullickson recalled Breding telling him that authorities wanted Breding to take a polygraph test and that Breding told him he would not take one. The trial court granted Breding's pretrial motion in limine preventing the State from offering evidence about any polygraph examinations. The states attorney informed Gullickson before trial that he could not testify about the polygraph statement for fear of the court granting a mistrial, and advised him to answer "no" when asked whether he talked to Breding.

Breding misapprehends Gullickson's trial testimony. Gullickson testified on direct examination:

"Q  Did you speak with the defendant on Sunday?

"A  I know he was at our place, but not that I can recall that—if it was, it was just a brief 'Hi.' I know he was visiting with kids out in the front yard.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;

"Q  Did you speak to the defendant on Monday?

"A  Not that I can recall."

Gullickson's response was not simply "no," but was "[n]ot that I can recall," and, apparently aware of the trial court's previous ruling, Breding's counsel chose not to cross-examine Gullickson on the recall issue. Gullickson's poor recall was before the jury and we see nothing in Gullickson's affidavit to suggest that the prosecution instigated any untruthful testimony. The trial court did not err in refusing to consider the states attorney's actions as prosecutorial misconduct and did not abuse its discretion in declining to grant a new trial on this basis. *See State v. Skaro,* 474 N.W.2d 711 (N.D.1991).

IV

Breding asserts that there was juror misconduct warranting a new trial. According to Breding's private investigator, he observed witnesses communicating with jurors after the parties completed presentation of evidence and before the court instructed the jury. Breding presented no evidence of any specific spectator comment to a juror and did not bring the matter to the court's attention at the time it occurred. At a subsequent hearing on the motion for new trial, the bailiffs testified that they were present in the hallway with the jurors during recesses, and did not hear the jurors or anyone else discuss the case.

Breding was aware, or should have been made aware by his private investigator, of the alleged juror misconduct during the trial. Yet Breding chose not to bring it to the trial court's attention at that time. When irregularities occur during a trial, the party affected must bring the problem to the court's attention so that the court may take appropriate remedial action. *State v. Abrahamson,* 328 N.W.2d 213 (N.D.1982). Breding has not pointed to any specific conversations between jurors and spectators about the trial proceedings. *See generally* Annot., *Prejudicial Effect, in Criminal Case, of Communications between Witnesses and Jurors,* 9 A.L.R.3d 1275 (1966). The bailiffs testified that they heard nothing improper. The trial court admonished jurors on several occasions during the trial to not talk with anyone regarding the case. We must assume, absent acceptable proof to the contrary, that the jury followed the instructions given by the trial judge. *City of Fargo v. Komulainen,* 466 N.W.2d 610 (N.D.1991).

The trial court has broad discretion in ruling on motions for mistrial or a new trial based on alleged juror misconduct. *State v. Abell,* 383 N.W.2d 810 (N.D.1986). Breding has not shown that the trial court abused its discretion in refusing to grant a new trial on the basis of alleged juror misconduct.

The judgment of conviction and the order denying Breding's motion for a new trial are affirmed.

SANDSTROM, NEUMANN, LEVINE and MESCHKE, JJ., concur.