Paul LARSON, Plaintiff and Appellee,

v.

WILLIAMS ELECTRIC CO–OP., INC.,
Defendant and Appellant.

Civ. No. 940156.

Supreme Court of North Dakota.

June 27, 1995.

Fred E. Whisenand (argued), McIntee & Whisenand, PC, Williston, for plaintiff and appellee; appearance by Dale Haugen.

Richard A. McKennett (argued), Winkjer McKennett Stenehjem Reierson & Forsberg, Williston, for defendant and appellant; appearance by Mark L. Stenehjem.

NEUMANN, Justice.

Williams Electric Cooperative [hereinafter Williams or Williams Electric] appeals from a jury verdict of $429,506 for damages to a dairy operation caused by stray voltage.[1] We reverse and remand for a new trial.

---

1. In order to understand stray voltage or neutral- to-earth voltage, one must first understand the

Paul Larson was a patron and member of Williams Electric. In the late 1970's Larson began construction of a new milking parlor on his farm. His plan was to increase his efficiency and thereby create greater cash flow. This milking parlor was completed in July of 1980 and went into production immediately after approval by the North Dakota State Dairy Inspector and an inspection by employees of the manufacturer of the milking system. Almost immediately Larson began noticing his livestock became very nervous and hard to handle around the milking equipment. This was followed by a dramatic reduction in milk production. Soon thereafter Larson's cows began suffering from chronic incidents of mastitis, a bacterial infection. If the mastitis bacteria become detectable in the milk, the farmer will receive a reduced price for his product. When the bacteria count reaches a certain level, the milk may not be sold.

Larson made numerous attempts over the next several years to curb his infection rates, but every effort failed. Meanwhile, the bacterial counts at times rendered the milk unmarketable. In an effort to rid himself of the problem, he disposed of and replaced his entire herd. However, each time he brought in new livestock they soon contracted mastitis. Eventually, Larson's veterinarian suggested the problem might be electrical in nature.

Larson turned to Williams Electric. The personnel of Williams, responding to his complaints, continually denied anything was wrong. Larson complained vigorously about getting shocked by some of the milking equipment. Eventually, Williams installed a blocker on Larson's electrical line that is designed to isolate and stop stray voltage problems.

Larson contends his problems began to diminish almost immediately. As he continued to replace his herd for a second time, he noticed the new animals did not suffer from mastitis, and were not nervous around the milking equipment. Eventually his problems subsided as his herd was replaced.

Williams contends that after the blocker/isolator was installed on Larson's service pole, Williams caused the North Dakota State Electrical Inspector to inspect the farm. The inspector made a number of suggestions and noted some deficiencies, all of which were remedied. Williams contends that any stray voltage problems resulted from the deficiencies, and that the corrections caused the turnaround in Larson's dairy operation.

After an extensive jury trial, a verdict was returned against Williams for $429,506. Williams challenges this verdict on many separate grounds, but we need only deal with two.

## I. The Trial Court's Exclusion of All Williams Electric Customers and Members From Jury Panel

 In the instant case, after the 40–person panel was seated, and after the parties argued their motions, the judge excused every member of Williams Electric Cooperative from the jury panel. This amounted to

---

neutral-grounded network. All electricity leaving an electrical substation must return to that substation in order to complete a circuit. Unless that circuit is completed, electricity will not flow. The current leaves the substation on a high voltage line which eventually connects to some electrical "appliance." After exiting the "appliance" that current must return to the substation. The neutral-grounded network provides the returning current two choices. Either it can return via the neutral line, which accounts for the second wire on our electrical poles, or it can return through the ground. These two pathways comprise the grounded-neutral network. Electricity flows through the path of lowest resistance. If there exists more resistance in the neutral line than in the ground, the current will flow through the ground to return to the substation.

Neutral-to-earth voltage or stray voltage will occur when current moves from either the neutral line to the ground or from the ground to the neutral line. It uses a cow as a pathway if that animal happens to bridge the gap between the two. A cow's hooves provide an excellent contact to the earth while standing on wet concrete or mud, while at the same time the cow is contacting the grounded-neutral system consisting of items such as metal stanchions, stalls, feeders, milkers, and waterers. The current simply uses the cow as a pathway in its eventual return to the substation. Apparently very slight voltages can affect cattle. Evidence in this case suggested anything greater than one volt can be catastrophic to a dairy farm.

12 people excused by the court, leaving a panel of 28 from which six jurors and one alternate were to be selected. Apparently the record of the arguments regarding the dismissal of the Williams Electric members is missing.[2] The trial court's reasoning, however, is reflected in its ruling on Williams' motion for judgment notwithstanding the verdict and motion for a new trial. In explaining its ruling to exclude the Williams Electric members from the jury, the trial court stated:

> Under the territorial integrity laws of the State of North Dakota, members of a rural electric are captive consumers. In other words, they have no choice as to where they get their power. This contrasts with membership in other cooperatives where members can choose other methods of marketing or purchasing.
>
> The Court had an interesting dilemma with which to deal.
>
> Williams Electric was being sued for hundreds of thousands of dollars. Notwithstanding arguments of the Defendant to the contrary, any cooperative member is sophisticated enough to understand that if a cooperative takes a hit of hundreds of thousands of dollars, there are some consequences. Whether those consequences are in the form of increased rates to members for their usage, reduced margins, or reduced patronage dividends or retirement benefits would depend on the situation.

Wililams asserts this dismissal of prospective jurors was improper. The standard of review for trial court rulings on jury challenges is abuse of discretion. *Sand v. Queen City Packing Co.*, 108 N.W.2d 448, 453 (N.D. 1961).

The relevant part of North Dakota's statute on challenges for cause states:

> Challenges for cause may be taken on one or more of the following grounds:
>
> . . . .
>
> 5. Interest on the part of the juror in the event of the action, or in the main question involved in the action, except his interest as a member or citizen of a municipal corporation.

NDCC § 28–14–06(5) (1991). We recently determined that "mere membership in a cooperative does not signify an interest sufficient to automatically disqualify a person from serving as a juror in a case involving the cooperative." *Cassady v. Souris River Tel. Coop.*, 520 N.W.2d 803, 806 (N.D.1994). In *Cassady* we held it was improper when choosing prospective jury members "to rely only on cooperative membership as an indication of prejudice." *Id.* at 806–07. We concluded the trial court in *Cassady* did not abuse its discretion when it refused to apply a blanket disqualification, and instead required that actual bias be established to disqualify a prospective juror, rather than presume a bias based only upon a relationship of a prospective juror. *Id.* In *Cassady* the judge observed that the damages were very low and membership in the cooperative was quite large. *Id.* at 806. As a result, "any financial interest individual members might have is essentially de minimis." *Id.* In other words, each member's stake in the result was so low that it would be improper for the trial court to presume bias on the part of a potential juror.

This court in the past has refused to adopt automatic or blanket disqualifications of potential jurors. *See id.* (upholding trial court's ruling that would not allow a blanket

2. We are very troubled by the missing portion of the record in this case. It appears court personnel may have lost the notes which included the argument concerning disqualification of prospective jurors based upon their membership in the Williams Electric Cooperative, as well as the voir dire examination of the jurors. Every party to every suit and the entire North Dakota judiciary recognizes the grave consequences of losing a portion of the record. The complete retrial of a case lasting many weeks would be a tremendous squandering of both our judicial resources and the resources of the parties. On the other hand, it also would be onerous to charge either the appellant or appellee with the duty of insuring that the physical record is preserved, when it is commonly understood that the actual preservation rests in the hands of court personnel. Unfortunately, one of these two approaches probably would be necessary if we were not able to discern what occurred during the missing portion. Here, both parties conceded at oral argument that no evidence of the interests of individual jurors as members of Williams Electric had been presented to the trial court.

disqualification based solely on cooperative membership); *Jerry Harmon Motors, Inc. v. First Nat'l Bank & Trust Co.*, 440 N.W.2d 704, 709 (N.D.1989) (refusing to require automatic disqualification of bank depositors from serving on a jury in an action involving the bank); *Basin Elec. Power Coop. v. Miller*, 310 N.W.2d 715, 719 (N.D.1981) (deciding that when the trial court finds ties between jurors and a party in the action are sufficiently attenuated, it is incumbent upon the party to challenge each juror for cause, and we will not find it error when the court refuses a blanket disqualification); *Farmers Union Grain Terminal Ass'n v. Nelson*, 223 N.W.2d 494 (N.D.1974) (concluding that blanket disqualification of all GTA members who had not dealt with the GTA grain elevator in question would not be advisable, due to the pervasive distribution of GTA members throughout the state and the resulting minimal nature of any interest any individual GTA member might have in the lawsuit). Instead, we adhere to a challenge-for-cause basis for dismissal of potential jurors. NDCC § 28–14–06; NDRCivP 47(c). In *Cassady*, 520 N.W.2d at 806, we cited with approval *Kimbley v. Kaiser Foundation Hospitals*, 164 Cal.App.3d 1166, 211 Cal. Rptr. 148, 152 (1985):

> "It is well settled that a remote or insignificant interest cannot support a challenge for cause. Customers of a defendant utility company may not be disqualified on the basis of their business dealings with that company. There must be some inquiry regarding the nature and extent of such a relationship."

Instead of a blanket disqualification of an entire group of potential jurors based on the mere existence of a relationship, NDCC subsection 28–14–06(5) requires an analysis of the extent of any individual interest in the outcome of the lawsuit that may exist because of the relationship. When NDCC section 28–14–06 is read in conjunction with NDRCivP 47(c), we are instructed that, after inquiry, the judge may excuse any individual juror for cause independent of any challenge by either party.

■ The trial court in the instant case determined the impact on all Williams Electric Cooperative members would *not* be de minimis. *Compare with Cassady*, 520 N.W.2d at 806 (deciding in that case "any financial interest individual members might have is essentially de minimis"). However, dismissal of a prospective juror for cause may be done only after individualized inquiry as to the nature of the alleged excluding interest. *See* NDRCivP 47(c); NDCC § 28–14–06. At oral argument, Larson conceded that no such individualized inquiry occurred. As a result the trial court erred.

■ Rule 61 of the North Dakota Rules of Civil Procedure provides:

> No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

In the instant case we are asked to set aside a verdict and grant a new trial as a result of a procedural error at voir dire. This error improperly excluded 30 percent of the potential jurors in the case without individualized inquiry, on the grounds of a perceived bias. It is North Dakota's policy that persons called for jury service "be selected at random from a fair cross section of the population of the area served by the court." NDCC § 27–09.1–01 (1991). When the trial court removed all Williams' patrons without inquiry, it excluded from the jury venire an identifiable group, and thereby deprived the parties a fair cross section of the population from which to select the jury. The United States Supreme Court in an analogous case concluded "[t]he American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community." *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 220, 66 S.Ct. 984, 985, 90 L.Ed. 1181, 1184 (1946). The Court was

concerned with the systematic exclusion of an identifiable group from the federal jury venire. We find the Court's logic persuasive.[3] Disqualification of all jurors belonging to an identifiable group without inquiry as to their actual bias, if left unremedied, threatens to erode our jury system. "The [potential] evil lies in the ... wholesale exclusion of a large class ... in disregard of the high standards of jury selection. To reassert those standards, to guard against the subtle undermining of the jury system, requires a new trial by a jury drawn from a panel properly and fairly chosen." *Id.* U.S. at 225, S.Ct. at 988, L.Ed. at 1187.

We do not take such action lightly; we are keenly aware of the scope and expense of this trial. However, to refuse to take such action would be inconsistent with substantial justice. *See* NDRCivP 61. We conclude the trial court's error was not harmless.

We must remand the case for a new trial.

## II. Statute of Limitations

■ Williams challenges the trial court's denial of its summary judgment motion based on the statute of limitations.

■ Williams claims Larson's knowledge of his stray voltage problem was sufficient to allow his claim to accrue between 1982 and 1984. Hence, the March 6, 1991, filing of the instant case exceeded the time allowed by the six-year statute of limitations. We have stated "the plaintiff's knowledge is a question of fact which [usually] prevents the application of summary judgment." *Biesterfeld v. Asbestos Corp. of America,* 467 N.W.2d 730, 736 (N.D.1991). However, it becomes a question of law if reasonable minds could draw but one conclusion. *Id.* Williams argues the issue of Larson's knowledge is a question of law. We disagree.

The trial court properly ruled that the question of when Larson had been apprised of facts which would place a reasonable person on notice a potential claim existed and his injury had been caused by the defen-

dant's negligence was a question of fact. *Id.* Because there existed issues as to material facts regarding this question, it would have been improper to grant summary judgment. The trial court correctly determined the jury was the final arbiter of disputed questions of fact, and properly placed the issue in their hands.

Reversed and remanded for a new trial.

LEVINE, MESCHKE and SANDSTROM, JJ., concur.

VANDE WALLE, Chief Justice, concurring.

I agree that persons are not to be excluded from a panel of prospective jurors because of status. However, Williams is not entitled to have its members on the jury as a matter of law. There is no indication that the jury finally seated was somehow less competent than it would have been had members of the cooperative been seated on the jury. Nor are we looking at a class that may be systematically excluded from jury service in which instance the rights of the class are also at issue. *See City of Mandan v. Fern,* 501 N.W.2d 739 (N.D.1993) [gender discrimination violates not only defendant's equal protection rights but also the excluded juror's rights].

There is nothing in the record to indicate the verdict was given under the influence of passion and prejudice on the part of the jurors. Because there is no right of equal protection to be vindicated, thus requiring reversal as a remedy, because there is no other reversible error, and because there is no indication that systematic exclusion of an identifiable group from jury venue is common place or, for that matter, occurs even infrequently, I would prefer to affirm. However, I yield to the wisdom of my colleagues in their desire to make a statement as to the importance with which we regard our jury system.

The reason I write separately is that I am concerned the practicing bar recognize this

---

3. We recognize this case is not a constitutional mandate; the Court was merely supervising the federal jury selection system. The Court subsequently stated that "[r]ules dealing with the selection of juries in federal courts, as announced in *Thiel v. Southern Pacific Co.,* 328 U.S. 217, 221, [66 S.Ct. 984, 986, 90 L.Ed. 1181], are not applicable in state court proceedings." *Brown v. Allen,* 344 U.S. 443, 473 n. 23, 73 S.Ct. 397, 416 n. 23, 97 L.Ed. 469, 497 n. 23 (1953).

decision has limited value as precedent. It is my understanding that Rule 61, NDRCivP, "Harmless Error," as discussed by this Court in *Sathren v. Behm Propane, Inc.*, 444 N.W.2d 696 (N.D.1989) is alive and well. *Sathren* stands for the proposition that even errors affecting the jury will not be grounds for reversal when there is "no demonstration of prejudice which would warrant a new trial." *Sathren, supra,* at 698. *C.f., State v. Breding,* 526 N.W.2d 465 (N.D.1995) [trial court has broad discretion in ruling on motions for mistrial or a new trial based on alleged juror misconduct].

Few errors, even with regard to the jury, require a new trial on the basis that to deny a new trial would be inconsistent with substantial justice. I am willing to join my colleagues in their statement, but the result does not indicate my willingness to broaden the definition of error which affects a substantial right of the parties.