1998 ND 170

**Damien David BREDING, Petitioner and Appellant,**

v.

**STATE of North Dakota, Respondent and Appellee.**

Civil No. 970401.

Supreme Court of North Dakota.

Sept. 15, 1998.

Rehearing Denied Oct. 14, 1998.

Janet Holter Zander, of Zander Law Office, P.C., Williston, for petitioner and appellant.

Jeffrey J. Peterson (argued), State's Attorney, Bowbells, and Michel W. Stefonowicz (appeared), Assistant State's Attorney, Crosby, for respondent and appellee.

NEUMANN, Justice.

[¶ 1] Damien David Breding appealed from a district court order denying his application for post-conviction relief. We affirm.

[¶ 2] In 1994, a jury found Breding guilty on two counts of murder and one count of attempted murder. The jury found Breding, at age 16, purposely set fire to the home of Bradley and Paula Peterson in Powers Lake during the early morning hours of March 31, 1991. The Petersons' twin six-year-old daughters died in the fire and Bradley Peterson was injured. Breding's convictions were affirmed on appeal by this court in *State v. Breding*, 526 N.W.2d 465 (N.D.1995). That opinion contains a detailed account of the facts, which will not be repeated here except

as necessary to explain and resolve the issues raised on this appeal.

[¶ 3] In requesting post-conviction relief, Breding claims his constitutional right to effective assistance of counsel at the criminal trial was violated when: (1) counsel failed to object to Bradley Peterson's hypnotically enhanced testimony or to attack the credibility of such testimony; (2) counsel failed to object to the introduction of out-of-court statements made by Breding to investigating officers; and (3) counsel failed to introduce evidence of Bradley Peterson's careless smoking habits as a possible cause of the fire. The district court rejected these arguments, concluding Breding received effective assistance of counsel during the criminal trial proceedings.

[¶ 4] The burden of establishing grounds for post-conviction relief rests upon the applicant. *State v. Kunkel,* 366 N.W.2d 799, 803 (N.D.1985). Effective assistance of counsel is guaranteed to a defendant under the Sixth Amendment to the United States Constitution, applied to the states through the Fourteen Amendment, and by Article I, Section 12 of the North Dakota Constitution. *State v. Ricehill,* 415 N.W.2d 481, 484 (N.D.1987). The issue of ineffective assistance of counsel is a mixed question of law and fact which is fully reviewable by this court. *Falcon v. State,* 1997 ND 200, ¶ 21, 570 N.W.2d 719. However, a trial court's findings of fact in actions for post-conviction relief will not be disturbed unless clearly erroneous, pursuant to N.D.R.Civ.P. 52(a). *Frey v. State,* 509 N.W.2d 261, 263 (N.D.1993). We summarized our standard for reviewing a claim of ineffective assistance of counsel in *Stoppleworth v. State,* 501 N.W.2d 325, 327 (N.D. 1993):

> "When a defendant raises an ineffective-assistance-of-counsel argument, it is the defendant's burden to prove that counsel's assistance was ineffective at trial. *State v. Skaro,* 474 N.W.2d 711, 714 (N.D.1991). In carrying that burden, the defendant must establish two elements. 'First, the defendant must prove that the counsel's performance was deficient. Second, the defendant must prove that the deficient performance prejudiced the defendant.' *State v. Wilson,* 488 N.W.2d 618, 622 (N.D.

1992) [citing *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)]. In attempting to prove the first element, 'the defendant must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." ' *State v. Skaro,* 474 N.W.2d at 715 (quoting *Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. at 2065). The second element requires the defendant to prove that, 'but for counsel's unprofessional errors, the result of the proceeding would have been different.' *Id.* (quoting *Strickland v. Washington,* 466 U.S. at 694, 104 S.Ct. at 2068). *See also State v. Bowers,* 426 N.W.2d 293, 295 (N.D. 1988); *State v. Thompson,* 359 N.W.2d 374, 377 (N.D.1985)."

I

Hypnotically Enhanced Testimony

[¶ 5] Bradley Peterson, the father of the deceased victims, testified at trial about waking to what he thought was the sound of liquid pouring and then an explosion with an instant fire. Prior to testifying at the trial, Peterson underwent a hypnosis session to enhance his recall of what happened when he awoke on the morning of the fire. The jury was never informed of the hypnosis session, and Breding's trial counsel did not attempt to discredit Peterson's testimony on the ground that it had been hypnotically enhanced. Breding asserts his trial counsel's failure to inform the jury of the hypnosis session and failure to attempt to discredit Peterson's testimony as a product of hypnosis constituted ineffective assistance of counsel.

[¶ 6] We approved the introduction of hypnotically enhanced recall testimony in *State v. Brown,* 337 N.W.2d 138, 151 (N.D.1983):

> "[H]aving weighed the benefits of hypnotically induced recall testimony against the inherent risks, we are not convinced that a witness should be rendered incompetent to testify merely because he or she was hypnotized during the investigatory phase of a criminal case. Rule 601 of the North Dakota Rules of Evidence provides that 'Every person is competent to be a witness except as otherwise provided in these

rules.' Our rules of evidence do not provide that a previously hypnotized witness is incompetent to testify. We believe that an attack on credibility is the proper method of determining the value of hypnotically induced testimony. *See* Rule 607, N.D.R.Ev.; *Chapman, supra*, 638 P.2d at 1284. Accordingly, we align ourselves with the majority of jurisdictions which have held that hypnosis affects credibility but not admissibility."

Breding claims an attorney's failure to attack the credibility of hypnotically enhanced testimony is, per se, deficient lawyering. We disagree.

[¶ 7] Breding's trial lawyer filed a preliminary motion *in limine* to restrict Bradley Peterson's testimony and hired an expert to review a video tape of the hypnosis session. At the post-conviction proceedings, Breding's trial counsel testified that after discussing the hypnosis issue with his expert and reviewing the law he concluded Peterson's testimony would be admissible and that "I couldn't blow it out of the water." He said his expert would not conclude Peterson's testimony could be discredited because of the hypnosis session. Breding's trial counsel concluded, as a matter of trial strategy, it was better not to inform the jury about the hypnosis to avoid the possibility the jury would give more, rather than less, credibility to the testimony because it had been hypnotically enhanced and thereby "divinely inspired."

[¶ 8] A similar ineffective assistance of counsel argument was rejected by the United States Court of Appeals for the Eleventh Circuit in *Spaziano v. Singletary*, 36 F.3d 1028, 1039–1040 (11th Cir.1994), *cert. denied*, 513 U.S. 1115, 115 S.Ct. 911, 130 L.Ed.2d 793 (1995):

"[C]ounsel made a strategic decision to keep from the jury the fact of the hypnosis . . . Counsel decided to pursue the strategy he did because he had abundant information to use in impeaching Dilisio, and he did not want to risk having the jury think that Dilisio's testimony was more reliable because it had been hypnotically refreshed . . . [C]ounsel's strategic decision to keep from the jury the evidence of hypnosis was not one of those relatively rare strategic decisions that is outside the wide range of reasonable professional assistance.

\* \* \* \* \* \*

"Counsel also knew that, as Spaziano concedes in his brief: '[t]here is a public misconception that hypnosis acts as a truth serum, preventing a hypnotized witness from lying.' Based upon that knowledge and his extensive experience as a criminal defense attorney, counsel made the strategic decision to keep from the jury the fact that Dilisio had been hypnotized.

\* \* \* \* \* \*

"Another factor requiring deference to counsel's judgment call in this case is that it was a decision based upon his perception of how the jury would react to the evidence of hypnosis. We have held that a defense attorney's sense of the jury's reaction to testimony or evidence is a sound basis on which to make strategic decisions."

■ [¶ 9] Breding's trial counsel attacked Peterson's credibility by emphasizing Peterson had been heavily drinking before falling asleep and was suddenly jolted awake by the fire. As a matter of strategy, he did not want to add legitimacy to Peterson's testimony by the fact it was hypnotically enhanced. An unsuccessful trial strategy does not make defense counsel's assistance defective, and we will not second-guess counsel's defense strategy through the distorting effects of hindsight. *Frey*, 509 N.W.2d at 263. We conclude Breding has failed to demonstrate he received ineffective assistance of counsel because his trial lawyer did not attempt to discredit Peterson's testimony on the ground it had been hypnotically enhanced.

II

Breding's Out–of–Court Statements

■ [¶ 10] Statements made by Breding during interviews of him by investigators were introduced into evidence. Breding asserts his trial counsel's failure to object to the admission of these statements constituted ineffective assistance of counsel. The need for additional representation protection of children has been recognized by our Legisla-

ture and codified under N.D.C.C. 27–20–26(1), which at the time of the original trial provided:

"1. Except as otherwise provided under this chapter, a party is entitled to representation by legal counsel at all stages of any proceedings under this chapter and, if as a needy person he is unable to employ counsel, to have the court provide counsel for him. If the party appears without counsel the court shall ascertain whether he knows of his right thereto and to be provided with counsel by the court if he is a needy person. The court may continue the proceeding to enable a party to obtain counsel and shall provide counsel for an unrepresented needy person upon his request. Counsel must be provided for a child not represented by his parent, guardian, or custodian. If the interests of two or more parties conflict, separate counsel must be provided for each of them." [1]

The "stages of any proceedings" under N.D.C.C. 27–20–26 are not limited to those instances which take place in the courtroom, but include circumstances such as interrogation, where the officer has focused his investigation on a particular suspect and is intent on gathering evidence. *In Interest of B.S.,* 496 N.W.2d 31, 32 (N.D.1993). If a minor is not represented by a parent, guardian, or custodian during interrogation when the investigation has focused upon him, he has a right to have an attorney present and that right cannot be waived. *Id.* at 32–33. If, however, the minor is represented by a parent, guardian, or custodian during the interrogation, the minor has a right to have an attorney present, but that right can be waived if the waiver is knowingly, intelligently, and voluntarily made. *Id.* at 33. N.D.C.C. 27–20–27(2) directs: "An extrajudicial statement, if obtained in the course of violation of this chapter or which would be constitutionally inadmissible in a criminal proceeding, may not be used against" a juve-

nile. *State v. Ellvanger,* 453 N.W.2d 810, 813 (N.D.1990).

▮ [¶ 11] The mere presence of a parent does not constitute representation. *State v. Grenz,* 243 N.W.2d 375, 380 (N.D.1976). To represent the interests of their child, parents must, at the very least, understand it was their role to advise the child at the interrogation and they must take an active role in the proceeding, rather than simply being present and answering questions directed to them by the interrogating officer. *In Interest of B.S.,* 496 N.W.2d at 33–34.

[¶ 12] The initial questioning of Breding by a deputy sheriff about 5 a.m. on the morning of the fire was for general investigatory purposes. Breding babysat the Peterson girls the night before the fire, and neighbors saw him in the area around the time the fire started shortly before 2 a.m. the following morning. The deputy testified he was seeking general information that morning and the investigation had not focused upon Breding, who was not then a suspect.

[¶ 13] Breding was later questioned on April 4 and again on April 5, 1991. Investigating Officer Dallas Carlson testified at the post-conviction hearing that the investigation had not focused upon Breding as a possible suspect until the April 5, 1991 interview. Miranda warnings were read to Breding on both April 4 and 5 and both Breding and his mother, who was present at the interrogations, signed waiver forms consenting to the interrogations and waiving the right to counsel. Carlson testified Breding's mother was very actively involved during the interviews and the questioning was like "interviewing two people at the same time." Carlson testified Breding's mother answered many of the questions at both interrogations, was actively involved, and, in his view, was acting on behalf of her son. Under these circumstances, Breding's trial lawyer concluded Breding's rights had not been violated and Breding's statements were admissible in court.

---

1. Amendments, not relevant to these proceedings, were adopted by the Legislature in 1995.

S.L.1995, Chapter 124, Section 13.

498

[¶ 14] Trial counsel's failure to object to the admission of Breding's out-of-court statements was based on his review of the law and the facts surrounding the taking of the statements. Counsel concluded the statements were not obtained in violation of Breding's legal rights and, additionally, the statements were "99 percent exculpatory and the other percent wasn't inculpatory." Strategic choices by trial counsel made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable. *State v. Schlickenmayer*, 364 N.W.2d 108, 112 (N.D.1985). We conclude Breding has not met his burden of demonstrating his trial lawyer provided ineffective assistance of counsel when he did not object to the out-of-court statements made by Breding.

### III

### Evidence of Bradley Peterson's Careless Smoking

[¶ 15] In support of his post-conviction petition, Breding submitted affidavits of persons purportedly having knowledge that Bradley Peterson was a careless smoker and had a habit of burning things by falling asleep while holding a cigarette, especially after he had consumed substantial amounts of intoxicating beverages. Breding asserts his trial lawyer provided ineffective assistance of counsel by failing to introduce instances of Peterson's careless smoking to raise an inference that Peterson started the fire with a cigarette.

[¶ 16] Breding's trial lawyer testified at the post-conviction proceedings that he had heard rumors about Peterson's careless smoking. He hired an investigator, who explored the rumors of careless smoking by Peterson but was unable to uncover good evidence of it. At the trial, Breding's expert witness testified the fire was not started with an accelerant but was an accidental fire that could have been started with smoking material. Breding's trial lawyer argued to the jury Bradley Peterson had been heavily drinking prior to falling asleep and was a smoker. He argued "the fire was started either by a cigarette discarded by an intoxicated Bradley, or by Paula [the girls' mother]

because of the couple's failing marriage." *Breding*, 526 N.W.2d at 471. The lawyer's argument was contradicted by Peterson's testimony that he had not smoked a cigarette before falling asleep that morning.

[¶ 17] We conclude Breding has failed to demonstrate his trial lawyer, under these circumstances, provided ineffective assistance of counsel by not offering additional instances of Peterson's careless smoking.

### IV

### Newly Discovered Evidence

[¶ 18] Breding also submitted affidavits stating Bradley Peterson carelessly started a fire in a trailer home in Minnesota several years after Breding's criminal trial. The firemen were able to extinguish the fire in Peterson's bed before it caused more extensive damage to the trailer home. Breding asserts this incident constitutes newly discovered evidence of Peterson's propensity to start fires and justifies a new trial for Breding on the criminal charges.

[¶ 19] Grounds for post-conviction relief include the situation where "[e]vidence, not previously presented and heard, exists requiring vacation of the conviction or the sentence in the interest of justice." N.D.C.C. 29–32.1–01(1)(e). This ground is similar to a request for a new trial based on newly discovered evidence under N.D.R.Crim.P. 33 and requires the same showing to obtain a new trial. See *Schlickenmayer*, 364 N.W.2d at 111.

[¶ 20] Breding's presentation of this issue to the district court was scant and confusing. In a single sentence added to his ineffective assistance of counsel issue in the application for post-conviction relief, Breding states that Peterson's starting a home fire subsequent to the original trial "should be further grounds for relief in terms of complete dismissal or new trial." However, throughout the post-conviction proceedings and in presenting final arguments to the district court Breding treated this post-trial fire evidence as simply one additional indication that Peterson was a careless smoker and that Breding's trial law-

yer provided ineffective assistance by not offering more careless smoking evidence.

[¶ 21] In its order, the trial court stated, "[e]vidence of fires *subsequent* to the trial was excluded by this court as it is not relevant to the ineffective assistance of counsel. [Trial counsel] could not know of future events." Breding has not identified any place in the record showing his post-conviction lawyer ever attempted to clarify to the trial court that she was raising a newly discovered evidence issue separate and apart from the ineffective assistance of counsel issue. Under these circumstances, we conclude Breding did not meet the burden of proving his right to a new trial on the ground of newly discovered evidence.

[¶ 22] The trial court's denial of the request for postconviction relief is affirmed.

[¶ 23] SANDSTROM and MARING, JJ., concur.

VANDE WALLE, Chief Justice, concurring specially.

[¶ 24] I concur in the result reached by the majority opinion. I write separately with respect to part II of the majority opinion concerning Breding's out-of-court statements. The majority relies on *In Interest of B.S.*, 496 N.W.2d 31, 32 (N.D.1993) for the statement that the "stages of any proceedings" under N.D.C.C. § 27–20–26, "include circumstances ... where the officer has focused his investigation on a particular suspect...." *In Interest of B.S.*, relies on *In Interest of J.D.Z.*, 431 N.W.2d 272 (N.D. 1988), which in turn relied on *In re J.Z.*, 190 N.W.2d 27 (N.D.1971). I concurred in the result, without opinion, in *B.S.* and *J.D.Z.* My concern was not with the result in those cases but with reliance on the "focus" test to define a "stage of the proceeding" within the meaning of N.D.C.C. § 27–20–26(1).

[¶ 25] When *J.Z.* was written, in 1971, this court arguably applied the then prevailing principle that the "focus" of an investigation was a stage of a proceeding which required the giving of *Miranda* warnings (*Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). *See State v. Iverson*, 187 N.W.2d 1 (N.D.1971), *cert. denied*, 404 U.S. 956, 92 S.Ct. 322, 30 L.Ed.2d 273 (1971). Subsequent to that decision, and following *Roberts v. United States*, 445 U.S. 552, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980), this Court, in *State v. Fields*, 294 N.W.2d 404, 407 (N.D. 1980), explicitly rejected the concept that mere investigatory focus requires *Miranda* warnings prior to any questioning and held that such warnings are required only in the inherently custodial interrogation for which *Miranda* was designed.

[¶ 26] Although *J.D.Z.* recognizes the holding in *Fields*, it observes it was "in the context of adult criminal proceedings where we were considering the application of the *Miranda* warnings, not a statutory right to counsel under the Juvenile Court Act (Chapter 27–20 N.D.C.C.)." *J.D.Z.*, at 275 n. 4. That statement is factually correct, but it and the cases on which it relies provide no principled discussion of why the "focus" test is appropriate for determining a stage of the proceedings for which counsel is required for juveniles but not for adults. There may be principled and persuasive reasons for so concluding but our prior cases do not discuss them. Because of the result reached by the majority opinion, this case is not an appropriate vehicle for that discussion. However, rather than continuing to concur in the result without opinion where the prior cases are followed and cited as support, I take this method to express my doubts as to the soundness of their holdings. I do so in the hope that in future cases where the issue arises, the parties and the Court will analyze the basis and the logic for the decisions.

[¶ 27] Finally, my reservations expressed in *State v. Brown*, 337 N.W.2d 138, 154 (N.D. 1983) (VandeWalle, J., concurring specially) have not diminished. I agree with Justice Meschke that we should reconsider the automatic admission of hypnotically aided recollections if there are no safeguards for reliability when the issue is properly before us.

[¶ 28] Gerald W. Vande Walle, C.J.

MESCHKE, Justice, concurring specially.

[¶ 29] I concur in the result. I write specially to suggest much graver legal problems lie in the shadows of this case than the

singular tactics of Breding's defense at trial left for post-conviction review.

[¶ 30] Neither the jury nor this court (in the direct appeal from Breding's convictions) knew hypnotically aided testimony by the father of the dead children had been used by the prosecution. Breding's defense counsel chose to "not seek a cautionary instruction or have an expert ... testify that it might be questionable evidence" because "the expert that I had wouldn't tell me that it was questionable evidence, ... and ... I didn't want to draw attention to it." Given the critical content of the father's testimony on waking to the sound of liquid pouring just before an exploding fire, and the shifting state of the law on hypnotically developed testimony, specifically, and "scientific" evidence, generally, this singular trial stratagem seems to have been oddly calculated for the complex dimensions of a double murder defense.

[¶ 31] In 1983, this Court held hypnotically enhanced testimony was not incompetent because hypnosis only affected the credibility of the testimony. *State v. Brown*, 337 N.W.2d 138, 151 (N.D.1983). The Court there recognized "such a procedure, as a means of obtaining accurate recall, has not 'gained general acceptance in the particular field in which it belongs,'" *id.* at 148, but "believe[d] that an attack on credibility is the proper method of determining the value of hypnotically induced testimony." *Id.* at 151 (citations omitted). The members of that Court thought they were "align[ing] ourselves with the majority of jurisdictions which have held that hypnosis affects credibility but not admissibility." *Id.* Yet, both the law and science have changed significantly since then.

[¶ 32] These trends make the use of hypnotically enhanced testimony much more dubious than the *Brown* Court anticipated, and even more so than cautioned in Justice VandeWalle's concurrence in *Brown*. Today, hypnotically enhanced testimony is quite suspect; it should *never* go into evidence unchallenged for its reliability.

[¶ 33] Currently, at least twenty-three states, "an emerging majority," hold hypnotically enhanced testimony wholly inadmissable, Gary M. Shaw, *The Admissibility of Hypnotically Enhanced Testimony in Crim-*

*inal Trials*, 75 Marq. L.Rev. 1, 16 n. 83 (1991), except for confrontation clause reasons; when a criminal defendant has previously been hypnotized and chooses to testify, the prosecution may not use a *per se* prohibition to exclude any of that defendant's testimony. *Rock v. Arkansas*, 483 U.S. 44, 62, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). Additionally, at least nine states hold a witness may only testify to posthypnotic memories if varying prophylactic guidelines, different in each state, were followed in the hypnotic sessions. Shaw, 75 Marq. L.Rev. at 16. Only five states, including North Dakota, and two federal circuits have held hypnosis only affects credibility, not admissibility. *Id.* at n. 80. According to a note by Dean R. Gallego, *Hypnosis and Criminal Defendants: Life In the Eighth Circuit and Beyond*, 53 Mo. L.Rev. 823, 826 (1988), North Dakota is the only state of seven in the Eighth Circuit that will admit hypnotically aided testimony without any safeguards against potential abuse. There are important reasons why so few courts allow hypnotically produced evidence without safeguards.

[¶ 34] The accuracy of hypnotic recall has no scientific foundation. *Rock* at 58–59, 107 S.Ct. 2704 (summarizing the conclusions of the Council on Scientific Affairs, *Scientific Status of Refreshing Recollection by the Use of Hypnosis*, 253 JAMA 1918, 1918–19 (1985)). Without canvassing vast scientific literature, I rely on the succinct dissent by Chief Justice Rehnquist for four members of the Court in *Rock*, who deftly summarized the current scientific views:

> [A] hypnotized individual becomes subject to suggestion, is likely to confabulate, and experiences artificially increased confidence in both true and false memories following hypnosis. No known set of procedures ... can insure against the inherently unreliable nature of such testimony.

*Id.* at 62, 107 S.Ct. 2704. *See also* Shaw, 75 Marq. L.Rev. at 6–44. Thus, even if hypnotically aided recollections do come into a criminal trial, the scientific community generally deems the evidence "inherently unreliable."

[¶ 35] "We believe that an attack on credibility is the proper method of determining

the value of hypnotically induced testimony." *Brown* at 151. That expectation led this Court to conclude hypnotically enhanced recollections should not be excluded as incompetent. But the adversary system did not function as the Court imagined it would. The supposed "attack on credibility" did not take place in Breding's defense.

[¶ 36] If a prosecutor permitted a defendant to testify to recollections dramatically enhanced by hypnosis, without directly challenging before the jury the credibility of that testimony for lack of scientific foundation, the judiciary, and the public, too, would be startled. A similar stratagem by the defense, as in this case, might not be quite so startling, but is still puzzling.

[¶ 37] Without an expert to educate the jury on the inherent unreliability of the hypnotically induced evidence, our rule of automatic competence fails miserably. *See Little v. Armontrout*, 835 F.2d 1240, 1245 (8th Cir. 1987)(the state's refusal to provide the defendant access to an expert on hypnosis violated due process); *see also Ake v. Oklahoma*, 470 U.S. 68, 86–87, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985)(indigent criminal defendant entitled to expert assistance). This sparse record leaves largely unexplained why Breding's defense did not make more use of the expert the trial court authorized for his assistance, or why his defense did not return to the trial court to authorize another expert to testify at Breding's trial to explain the lack of reliability of the father's hypnotically aided evidence.

[¶ 38] Moreover, the failure of Breding's defense to request a cautionary instruction is also mostly unexplained. An implication that an instruction would unduly "draw attention" to the evidence is unpersuasive. Jurors are not dummies. When properly educated by counsel and the court, they can readily grasp the implications of scientific evidence or of the lack of scientific authenticity.

[¶ 39] In a state where hypnotically enhanced evidence is automatically excluded, failure to object to its admission, let alone failure to request a judicial caution to the jury, would undoubtedly be ineffective assistance of defense counsel in the defective sense. *Compare Little v. Armontrout*, 819 F.2d 1425, 1434–35 (8th Cir.1987)(holding

failure to use procedural safeguards to ensure the reliability of hypnotically induced testimony reduces its value so far that its use was constitutional error), *vacated and modified en banc*, 835 F.2d 1240 (8th Cir.1987), *cert. denied*, 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988) (*rev'g sub nom State v. Little*, 674 S.W.2d 541 (Mo.1984)(en banc), *cert. denied*, 470 U.S. 1029, 105 S.Ct. 1398, 84 L.Ed.2d 786 (1985)); *State v. Munson*, 886 P.2d 999, 1003–04 (Okla.Crim.App.1994)(post-conviction reversal of murder and kidnaping convictions affirmed where prosecution deliberately withheld exculpatory evidence, including hypnosis of a witness that would have made testimony inadmissible). The failure in this case to fulfill the judicial expectations of expert evidence, cross-examination, and requested instructions to educate the jurors on the complete lack of reliability of hypnotically aided recollection demonstrates a need for North Dakota to reconsider the standards for use of hypnotically assisted testimony. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)(emphasizing "gatekeeper" role of trial court in admitting or excluding "scientific" evidence). "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 591–92, 113 S.Ct. 2786. The trial court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93, 113 S.Ct. 2786. *See also General Elec. Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 519, 139 L.Ed.2d 508 (1997)(trial court did not abuse its discretion in excluding expert opinions based upon animal studies that "were not sufficient, whether individually or in combination, to support their conclusions that [litigant's] exposure to PCBs contributed to his cancer"); *United States v. Scheffer*, —— U.S. ——, 118 S.Ct. 1261, 1265, 140 L.Ed.2d 413 (1998) (citations omitted)(affirming per se rule against admission of polygraph evidence favorable to the accused in court martial proceedings):

> [T]he exclusion of unreliable evidence is a principal objective of many evidentiary rules.

*Id.* Considering the trends of the law, North Dakota should reconsider the automatic admission of hypnotically aided recollections without safeguards for reliability.

[¶ 40] But that relief was not sought in this case. Therefore, I hesitantly agree with the majority's conclusion that defense counsel's "unsuccessful trial strategy does not make defense counsel's assistance defective" because we should not "second-guess counsel's defense strategy through the distorting effects of hindsight." Yet, I remain very uneasy.

[¶ 41] This defense counsel's choices are very troubling when he did not at all contest the reliability of a key piece of hypnotically developed testimony, did not at all contest the admissibility of several key admissions of a juvenile defendant who was unassisted by counsel during questioning, and did not permit the juvenile's anguished mother to witness for him. Despite counsel's statement that he "didn't think I needed witnesses because I was satisfied in my mind that the state [had] failed in its proof ...," his singular stratagem in a circumstantial homicide case is barely comprehensible. What may be aptly classed as failed trial strategy in this case gives me little confidence in the accuracy of the verdict.

[¶ 42] Given the relevant trends of law and science on the subject, I believe no defense counsel should be able hereafter to disclaim responsibility for not vigorously contesting the reliability of such evidence before the jury itself. Neither the jury nor a reviewing court should ever again be left uninformed about the suspect character of a significant piece of evidence in an important felony case like this.

[¶ 43] With considerable concern, I reluctantly concur in this result.

[¶ 44] Herbert L. Meschke